# IN THE SUPREME COURT OF IOWA

No. 09–0844

Filed September 9, 2011

**DAVID R. DESIMONE,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Clinton County, David H. Sivright, Jr., Judge.

Applicant seeks further review of a court of appeals decision affirming his conviction for sexual abuse in the third degree. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.**

Mark R. Lawson, Maquoketa, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Matthew Remissong, Student Legal Intern, Michael L. Wolf, County Attorney, and Ross J. Barlow, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

In this appeal, we must decide if the State's failure to turn over a witness's timecard showing that the witness could not possibly have seen the events to which she testified constitutes a *Brady* violation.[1] In the postconviction relief action, the district court found no violation occurred. On appeal, the court of appeals affirmed the judgment of the district court. On further review, we find a *Brady* violation occurred. Therefore, we reverse the judgment of the district court and remand the case for the district court to enter an order vacating the defendant's conviction for sexual abuse and ordering a new trial on the sexual abuse charge.

### I. Background Facts and Proceedings.

A jury convicted David R. DeSimone of sexual abuse in the third degree in violation of Iowa Code sections 709.1 and 709.4(1) (2003). DeSimone stipulated he committed prior felonies, and the district court determined the habitual offender sentencing provisions under Iowa Code sections 902.8 and 902.9(3) applied. The district court sentenced DeSimone to a term of imprisonment not to exceed fifteen years.[2]

DeSimone's sexual abuse conviction stems from events that took place in his home on October 16–17, 2004, when DeSimone hosted a birthday party for his eighteen-year-old cousin. One of the attendees was Samantha, a seventeen-year-old. Samantha consumed between six and twelve glasses of beer during the party and was heavily intoxicated.

---

[1]*See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97, 10 L. Ed. 2d 215, 218 (1963) (holding due process requires the prosecution to disclose exculpatory evidence to the accused).

[2]DeSimone pled guilty to several misdemeanor offenses and was also sentenced for these offenses at the same sentencing hearing.

Her memory of the party was spotty. She remembered events early in the night, including using DeSimone's cell phone to call a friend. She did not remember an incident with DeSimone in a downstairs bathroom that resulted in a fight between DeSimone and other males at the party.

At trial, Samantha testified to the following. She recalled placing her head down on the kitchen table while the party was still well attended. Her next memory was sitting naked in DeSimone's bed. She was confused and did not know why her clothes were off. It was then she discovered her tampon had been removed. She observed DeSimone standing near the bedroom light switch with a blanket around him. DeSimone then turned off the light and "came over and got on top of me." She attempted to push him off and screamed loudly for a period of five minutes. DeSimone grabbed her by the throat and threatened her. Then, DeSimone forced her to engage in vaginal intercourse. She became sick to her stomach and vomited on DeSimone's bed, sheets, and in her hair. After vomiting, she claims DeSimone forced her to have oral sex and then, for a second time, vaginal intercourse. She also claims that DeSimone told her during intercourse that he was not going to ejaculate on her so he would not leave any evidence.

After intercourse, Samantha put on her clothes and quickly ran out of the house. She said she was unable to find her glasses, purse, or underwear so she left without them. She stated a car almost hit her when she ran across Camanche Avenue, the street outside of DeSimone's home. She eventually ran to a nearby Hy-Vee grocery store.

Joseph Baker, a party attendee, went into DeSimone's bedroom to find his coat after the party had ended. He saw Samantha sleeping in DeSimone's bed. Fearing he was too intoxicated to drive, Baker sat down on the couch in the living room adjacent to DeSimone's bedroom. He fell

asleep with the television on and slept until around 6 a.m. Baker did not hear any screaming that evening.

Jeffery Hereid, the grocery store attendant, confirmed that Samantha entered the store early on the morning of October 17 with her clothes disheveled, hair messed up, and crying. Samantha asked to use the phone and called a friend. She then called 911 at the urging of the grocery store attendant. Samantha made the dispatch call from the Hy-Vee at 3:06 a.m. on October 17.

Brad Nolan, a special agent with the Iowa Division of Criminal Investigation, responded to the call. Upon arrival, Nolan discovered Samantha and described her as distraught and visibly upset. Nolan had difficulty eliciting information from Samantha, but eventually she informed him DeSimone had sexually assaulted her. Samantha was taken to a local hospital where a rape protocol was followed and a rape kit was used to collect evidence.

At the hospital, Samantha was tearful and nauseous. A nurse took Samantha's medical history and her description of the assault. The assault history Samantha provided differed in some respects from her trial testimony. She told the nurse she had consumed six or seven glasses of beer. She did not report that she had passed out before the assault. Samantha stated DeSimone first forced her to perform oral intercourse before he forced her to perform vaginal intercourse. She also told the nurse she did not discover that her tampon was out until she was at the hospital. The hospital discharged Samantha at 6:45 a.m. on October 17.

Nolan obtained a search warrant for DeSimone's home. He and several other officers executed the warrant in the late morning of October 17. The officers collected DeSimone's bedding and sheets. They

also seized a blanket found in DeSimone's basement where the washer and dryer were located. One officer involved in the search opined he saw no signs that DeSimone had destroyed evidence in the house.

The department sent the seized evidence to the Iowa Division of Criminal Investigation for deoxyribonucleic acid (DNA) testing. The DNA testing revealed small amounts of DeSimone's blood on his pillowcase. Additionally, there were two semen stains containing DeSimone's DNA on the blanket found in the basement by the washer and dryer. No semen, blood, or vomit was detected on the seized sheets and bedding. DeSimone's DNA was not found on Samantha.

Officers and medical personnel found no evidence of physical abrasion or redness on Samantha, nor did they observe any vomit on Samantha. The treating physician found no physical evidence of injury or trauma, but also stated that this was not unusual in sexual assaults. The physician noted Samantha was at the end of her menstrual period, and it was not unusual for women to go several hours without any discharge of blood.

Before trial, the court granted DeSimone's motion in limine to exclude evidence of his prior bad acts, specifically his two jury-trial acquittals involving allegations that he sexually abused his stepdaughter and his wife's niece. DeSimone's trial counsel, William Vilmont, however, affirmatively informed the jury about these two prior sexual abuse allegations during his cross-examination of Samantha.

While not returning to DeSimone's previous sexual abuse charges, Vilmont, on numerous occasions, engaged in a line of questioning that showed Samantha had contacts with people familiar with DeSimone and who had reasons to dislike him. Vilmont elicited a response from Samantha that she previously lived with S.R.—the niece of DeSimone's

estranged wife. S.R. had previously made sexual abuse allegations against DeSimone. Vilmont also elicited a statement from Samantha that the friend she called from the Hy-Vee store, before calling the police, was at S.R.'s house at the time of the call. Vilmont also questioned Samantha about whether she knew her son's grandmother did not like DeSimone and that the grandmother had been romantically involved with DeSimone's roommate. Vilmont elicited testimony from Nolan that he used S.R.'s testimony to corroborate Samantha's testimony in order to obtain a search warrant for DeSimone's home. In addition, Vilmont asked Nolan whether he knew of S.R.'s connection to DeSimone. This testimony indicates Vilmont was trying to establish that Samantha was collaborating with the persons who disliked DeSimone in order to convict him.

The State called several witnesses to corroborate Samantha's testimony. It called Baker to testify he saw Samantha sleeping in DeSimone's bed, fully clothed, as the party wound down. The State also called Hereid, the grocery store attendant, to testify about Samantha's appearance and actions at the Hy-Vee store she ran to for help. The State also called Nicole as a witness.

Nicole was an eighteen-year-old high school student who met Samantha about two months prior to trial through a mutual friend. Nicole testified that one evening she and Samantha were driving on Camanche Avenue, the road DeSimone's home is on, and Samantha told her about the sexual assault. According to Nicole, Samantha's story triggered her memory of an incident that occurred after leaving work early one morning in October 2004. Nicole testified she got off work from Burger King at 2:30 a.m. and, while driving on Camanche Avenue, a girl "ran right in front of my vehicle to try to get me to stop, but I almost hit

her, so I swerved." She stated she did not stop because she was scared and did not call the police because she was not sure what was going on.

Twice during her testimony, Nicole stated this incident occurred on October 13, not October 17. The prosecutor questioned Nicole as to whether the incident occurred on October 13 or 17. She responded, "It was somewhere around there. I can't—I thought it was the 13th, but it might not have been. It was a long time ago." The prosecutor used Nicole's testimony to corroborate Samantha's testimony that a car almost hit Samantha as she ran out of DeSimone's house and across Camanche Avenue.

DeSimone's counsel minimally engaged Nicole on cross-examination. His sole line of questioning was to elicit from Nicole that she was driving to a bar/pool hall on the night she saw a girl run across Camanche Avenue.

After his conviction, DeSimone filed a direct appeal of his conviction and sentence, which the court of appeals affirmed. While the direct appeal was pending, DeSimone investigated Nicole's testimony. DeSimone claimed, after reading the trial transcript, that Nicole's testimony struck him as very coincidental and that he heard somebody mention Nicole's name in conjunction with Burger King during the trial.

DeSimone wrote a letter to Burger King asking about the hours Nicole worked on October 16–17. Burger King responded with a letter and timecard copy showing Nicole punched out of work at 3:30 a.m. on October 17. Burger King's letter also stated that Burger King had provided copies of Nicole's timecard to the Clinton Police Department in August 2005, several weeks before DeSimone's trial. Samantha called 911 at 3:06 a.m. on October 17 from the Hy-Vee store. Thus, Nicole's timecard establishes that Nicole could not have seen Samantha running

across Camanche Avenue on the morning of October 17 as the prosecutor contended. We will set out additional facts as they relate to this appeal.

After DeSimone lost his direct appeal, he filed an application for postconviction relief. The district court denied DeSimone's postconviction relief application and DeSimone appealed. We transferred the case to the court of appeals. The court of appeals affirmed the district court's denial of DeSimone's postconviction relief application. DeSimone asked for further review, which we granted.

## II. Issues.

Two grounds are at issue in this appeal. First, DeSimone asserts he received ineffective assistance of counsel because his trial counsel affirmatively disclosed DeSimone's prior sexual abuse acquittals to the jury, even after trial counsel secured a motion in limine to exclude the State from eliciting this evidence. Second, DeSimone alleges the State committed a *Brady* violation when it failed to reveal to DeSimone that Nicole's timecard showed she did not leave work until 3:30 a.m., approximately twenty-four minutes after Samantha called the police from the Hy-Vee store. The issue involving the *Brady* violation is dispositive of this appeal. Therefore, we will not address the ineffective-assistance-of-counsel claim.

## III. Standard of Review.

When the applicant's claims are of a constitutional nature, we will conduct a de novo review. *Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010). Accordingly, DeSimone's *Brady*-due-process-violation claim will be reviewed de novo.

**IV.** *Brady*-**Due-Process-Violation Claim.**

**A. Error Preservation.** The State argues DeSimone did not preserve error on his *Brady* claim because he could have found the material through reasonable diligence. The State cites to a line of cases holding a court will only grant a motion for new trial based upon newly discovered evidence if the evidence could not have been obtained through reasonable diligence. *See State v. Jefferson*, 545 N.W.2d 248, 249 (Iowa 1996) (citing *State v. Miles*, 490 N.W.2d 798, 799 (Iowa 1992)). The cited case and its progeny are appellate court decisions reviewing district court decisions in granting or denying new trials. *Id.* The State's cited doctrine is not an error preservation issue, but a standard we have adopted in deciding whether to grant a new trial. The State's authority has no applicability to error preservation when a *Brady* violation is claimed. Its argument is relevant, however, as to whether the State suppressed the alleged exculpatory evidence in our analysis of a *Brady* violation.

**B. *Brady* Standard.** DeSimone asserts the State violated his due process rights[3] by failing to disclose favorable evidence to him and this failure constitutes a *Brady* violation. Specifically, DeSimone argues the State's failure to disclose the Burger King accountant's email detailing Nicole's timecard on October 16–17 runs afoul of *Brady*. The email was sent to the Clinton Police Department and forwarded to prosecuting

---

[3]In his postconviction relief application, DeSimone asserted the State violated his due process rights under both the Federal and Iowa Constitutions. At no point on appeal, however, has DeSimone argued that the Iowa Constitution provides a different level of protection than the United States Constitution or that a different analysis should apply under the United States Constitution. Therefore, for the purposes of this appeal, we will consider the constitutional provisions as congruent.

attorney Ross Barlow on September 6, 2006, approximately one week before trial and is favorable to DeSimone.

To establish a *Brady* violation has occurred, DeSimone must prove by a preponderance of the evidence "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt." *Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003) (quoting *State v. Veal*, 564 N.W.2d 797, 810 (Iowa 1997)) (internal quotation marks omitted); *accord Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286, 302 (1999).

1. *Suppression of evidence.* The prosecution "has a duty to learn of any favorable evidence known to . . . others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490, 508 (1995). Nondisclosure of evidence is the touchstone for suppression; the good or bad faith of the prosecutor is not relevant. *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996). The prosecution has a duty to disclose regardless of whether the accused requests *Brady* material. *Harrington*, 659 N.W.2d at 522. "Nonetheless, 'if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence,' the evidence is not considered 'suppressed.' " *Id.* (quoting *Cornell v. State*, 430 N.W.2d 384, 385 (Iowa 1988)); *accord United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009); *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). However, before holding a lack of diligence on the part of defense counsel, defense counsel must be aware of the potentially exculpatory nature of the evidence and its existence. *See United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (stating a *Brady* violation does not exist where the defendant or his attorney knew

of the alleged exculpatory information); *Harrington*, 659 N.W.2d at 522 (holding although the defendant had knowledge of the existence of the police reports, the defendant "did not have the 'essential facts' of the police reports so as to allow the defense to wholly take advantage of this evidence [and] 'only access to the documents themselves would have provided the range and detail of information necessary to fully understand the implications of the police investigation' " (quoting *Mazzan v. Warden*, 993 P.2d 25, 37 (Nev. 2000))).

We must address two[4] "suppression" issues. First, the factual issue of whether Barlow did in fact fail to send Vilmont the email from Burger King, indicating that Nicole was working when she claimed she saw Samantha crossing the street. Second, there is an issue whether defense counsel used "reasonable diligence" to secure the same information from Burger King.

Concerning the first suppression issue, the record is clear that Barlow did not include the email in his trial notebook or fax a copy of it to Vilmont. Barlow suggested he hand-delivered a copy of the email to Vilmont, as that would be his normal practice. Vilmont testified at the postconviction relief hearing that he did not receive the information, but also admitted he did not review the file before the postconviction relief

---

[4]There is also some precedent that suggests that an "open-file policy" satisfies a prosecutor's *Brady* requirements. *See, e.g.*, *Mathis v. Dretke*, 124 Fed. App'x 865, 877 (5th Cir. 2005). The issue need not be confronted here because the record shows the email detailing Nicole's timecard was not in Barlow's trial notebook; therefore, the "open-file policy" would not disclose the information. *Strickler*, 527 U.S. at 284, 119 S. Ct. at 1949, 144 L. Ed. 2d at 303 (1999) ("If it was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination, we think such reliance by counsel appointed to represent petitioner in state habeas proceedings was equally reasonable.").

hearing. There are several reasons, however, that cause us to find on our de novo review that Barlow did not hand-deliver the email to Vilmont.

First, it is inconceivable that Barlow would have used Nicole as a witness if he knew her testimony was false and he provided the information proving her testimony was false to Vilmont. As a prosecutor, Barlow had an ethical duty not to present testimony that he knew to be false. Iowa R. of Prof'l Responsibility 32:3.3(b). This ethical duty is consistent with the American Bar Association's standards applicable to prosecutors. *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* 3-5.6(a) (3d ed. 1993) ("A prosecutor should not knowingly offer false evidence . . . .").

Second, Vilmont testified that he shared all documentation with DeSimone, who scrupulously reviewed the material. Had DeSimone seen this email, he most certainly would have brought it to the attention of Vilmont, as the email destroys the credibility of one of the State's few corroborating witnesses.

Third, given the impeachment value the email would have had on Nicole's testimony, it is difficult to believe that an experienced criminal defense lawyer like Vilmont would not have used the evidence at either Nicole's deposition or on cross-examination at trial. Vilmont testified to as much, stating he "would have used it, certainly."

The second suppression issue concerns whether evidence of Nicole's timecard was reasonably available to Vilmont and whether Vilmont exercised reasonable diligence to obtain it. Vilmont confirmed he received a copy of Nicole's police interview conducted on August 29, 2005. Vilmont also received Nicole's employment verification report, dictated on August 25, 2005, indicating Burger King was going to send

Nicole's timecard for October 16–17 to the Clinton Police Department. Therefore, Vilmont should have been aware of Nicole's expected corroborative testimony and that her timecard for the evening in question was forthcoming.

The State argues that Vilmont had equal access to the information and should have subpoenaed the records himself. We disagree. A defense attorney should not have a duty to investigate every witness to determine whether a prosecutor knowingly offers false testimony, when there is no reason to believe that the prosecutor would offer such testimony. The State received this information late in the game. Both parties were preparing for trial. At no time prior to trial did the State indicate to Vilmont that they would not be calling Nicole as a witness. A reasonable attorney in Vilmont's situation would have believed the State would not knowingly call a witness that would give false testimony. Thus, Vilmont acted reasonably in believing the information received from Burger King was not exculpatory.

We believe Vilmont never received the records the State possessed establishing that Nicole was working at the time she allegedly saw Samantha cross Camanche Avenue and that Vilmont exercised reasonable diligence in the matter since there is no way he knew or should have known of the exculpatory nature of the email. Accordingly, we find the State suppressed the evidence provided by Burger King in violation of *Brady*.

2. *Favorability.* "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481, 490

(1985) (quoting *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196, 10 L. Ed. 2d at 218) (citation omitted); *accord Romeo*, 542 N.W.2d at 551.

With minimal physical evidence, Samantha's credibility was essential to the State's case. The State called three lay witnesses for the primary purposes of corroborating Samantha's testimony and bolstering her credibility. Baker testified he saw Samantha sleeping, fully clothed, in DeSimone's bed. Hereid testified Samantha came to the Hy-Vee store looking disheveled and crying. Nicole's testimony corroborated how Samantha left DeSimone's apartment and ended up at the Hy-Vee store. It also helped corroborate that Samantha was emotionally unstable and reckless after the sexual assault. Nicole's timecard impeaches her testimony, showing it was impossible for Nicole to have seen Samantha run across Camanche Avenue on October 16–17. In a case that hinges on a victim's credibility, evidence that impeaches one of the victim's few corroborating witnesses is, without question, favorable to the accused. DeSimone has met his burden of proof that the evidence is favorable to his guilt or innocence.

3. *Materiality.* Due process is only denied when the favorable, suppressed evidence is material to the issue of guilt. The Supreme Court stated evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383, 87 L. Ed. 2d at 494; *accord Harrington*, 659 N.W.2d at 523.

> "[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the

> question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' "

*Harrington*, 659 N.W.2d at 523 (quoting *Strickler*, 527 U.S. at 290, 119 S. Ct. at 1952, 144 L. Ed. 2d at 307 (alteration in original) (citation omitted)). Thus, the materiality requirement requires the court to assess the possible effects nondisclosure had on trial preparation and strategy, not merely the weight of the evidence. Materiality requires a "reasonable probability" of a different trial outcome, not merely a "reasonable possibility." *Strickler*, 527 U.S. at 291, 119 S. Ct. at 1953, 144 L. Ed. 2d at 308.

The State was unable to present any DNA or medical evidence to substantiate Samantha's claim of sexual abuse. Indeed, there was none. The State's case turned on the credibility of Samantha and the corroborating witnesses. These witnesses' testimony corroborated Samantha's testimony that she was sexually abused. However, had DeSimone been provided the evidence to which he was entitled, Nicole's testimony would have been shown to be false and the trial would have taken on a different dynamic. The defense's conspiracy theory had credibility where the evidence showed Samantha had contacts with persons who disliked DeSimone. Bringing Nicole's false testimony into the conspiracy theory completes the picture.

Additionally, Samantha's testimony is not without some question of credibility. Much of Samantha's testimony was inconsistent with other statements she made and the physical evidence. She said she left DeSimone's house without her purse and underwear. The police found her purse, but not her underwear, while searching DeSimone's home. Samantha testified she vomited in her hair and on the bed sheets. The police did not find vomit in her hair or on the bed sheets. Finally,

Samantha gave inconsistent versions of how the sexual assault occurred. At trial, she stated that she knew her tampon was out at DeSimone's house and that he first assaulted her vaginally, then orally. In the hospital records, she stated that she did not know her tampon was out until she was at the hospital and that DeSimone first assaulted her orally, then vaginally.

Accordingly, we hold the State's failure to disclose the Burger King timecard was a *Brady* violation.

**V. Disposition.**

Due to the *Brady* violation, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court to enter an order vacating DeSimone's conviction for sexual abuse and ordering a new trial on the sexual abuse charge.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except Mansfield, J., who takes no part.