# IN THE COURT OF APPEALS OF IOWA

No. 20-0369
Filed November 3, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**EZEKIEL CORTEZ PHILLIPS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Jason D. Besler, Judge.


        Ezekiel Phillips appeals his convictions, asserting discovery violations and prosecutorial misconduct deprived him of a fair trial. **AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Darrel Mullins, Assistant Attorney General, for appellee.


        Heard by Bower, C.J., Greer, J., and Danilson, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**BOWER, Chief Judge.**

Ezekiel Cortez Phillips Jr. appeals his convictions for first-degree murder, attempted murder, willful injury causing serious injury, and going armed with intent. Phillips asserts the court failed to adequately sanction the State for its violation of discovery orders, failure to disclose favorable evidence, and pattern of repeated prosecutorial misconduct. Consequently, he maintains the court abused its discretion in denying his motions for mistrial or new trial. We affirm.

### I. Background Facts

In December 2018, Phillips was dating Mone Dotson. Late on December 18, Phillips and Dotson argued on the phone. Dotson's friend Tyonna Nathan was at Dotson's apartment with her at the time. Tyrice Douglas also came to the apartment where the three smoked marijuana. The trio went to a store and broadcast a livestream video, and then they returned to Dotson's apartment to eat and smoke some more. Dotson and Douglas retreated to her bedroom.

A man entered the apartment around 2:30 the next morning with a gun. Nathan, who was sitting on the couch and talking on the phone but not wearing her glasses at the time, identified the person as Phillips. The man walked directly to the bedroom, said "Where that n**** at?", and opened fire. Dotson and Douglas each sustained multiple gunshot wounds.

Nathan ran from the apartment and called 911, reporting Dotson's boyfriend "Ziek" shot her. Dotson, who had multiple gunshot wounds and was bleeding, ran to the bathroom and also called 911. The man left the apartment as Douglas lay unconscious on the bed. The man returned to the apartment, and the ensuing confrontation was recorded during Dotson's 911 call. Dotson escaped and found

help at a house three blocks away. She called 911 again and told the operator Phillips was the shooter. First-responders found Douglas unconscious in the bedroom with multiple gunshot wounds. His injuries required surgery and significant treatment. Dotson was also hospitalized.

On December 20, officers found and arrested Phillips. Phillips said he heard about the shooting but denied any involvement. Officers searched Phillips's residence and found the same type of shoe as the shooter wore, but no blood or incriminating DNA was found on any of Phillips's seized property. The officers did not find any indication Phillips owned a gun, and the shell casings found in Dotson's apartment did not yield fingerprint evidence.

In March 2019, Douglas was released from the hospital but was still paralyzed on one side. On May 2, Douglas returned to the hospital. He was suffering from an esophageal ulcer, thromboembolism, and abscesses on his brain. He died on May 6. The medical examiner opined a bacterial infection, which resulted from one of Douglas's December 2018 gunshot wounds, spread to his brain. The medical examiner determined "complications of remote gunshot wounds" caused Douglas's death.

## II. Proceedings

On January 4, 2019, Phillips was charged via trial information with two counts of attempted murder, two counts of willful injury causing serious injury, and one count of going armed with intent. Phillips pleaded not guilty and demanded a speedy trial.

On February 6, Phillips filed a discovery motion, seeking an order compelling the State to provide for inspection, copying, or testing of an extensive

list of evidentiary items "material to the preparation of the defense, or are intended for use by the state as evidence at the trial."[1] The court granted the motion. Neither the motion nor the order provided a date by which the materials were to be produced.[2]

On February 28, Phillips waived his right to a speedy trial, and a jury trial was scheduled to start on May 6. After an April 11 pretrial conference, trial was continued until September.

In July, the State moved to amend the counts of attempted murder and willful injury concerning Douglas with a charge of first-degree murder. A copy of the autopsy report was provided to Phillips. On August 7, defense counsel requested any medical records related to the autopsy report. The county attorney advised no other medical documents had yet been received.

On August 23, after a hearing on the motion to amend the trial information, the court denied the motion, finding murder constituted a wholly new and different offense. On September 5, the State filed a new trial information charging Phillips with first-degree murder and moved to consolidate the two cases. Phillips's

---

[1] The relevant portions of the motion sought production of "[a]ll the results or reports of any scientific or physical tests or experiments made in connection with the alleged offenses, including but not limited to DCI laboratory reports and medical records" and "[a]ll contents of the investigating law enforcement agencies electronic and physical files compiles as a result of the investigation into the allegations underlying the Information filed in this case matter." Phillips also asked for orders "compelling the State to inform [him] of all evidence known to the State and its officers which is material to the credibility, reliability, and/or impeachment of all the State's witnesses" and "compelling the State of Iowa to comply with its continuing duty [of] disclosure under [Iowa] Rule [of Criminal Procedure] 2.14(5)."
[2] At this time, the Cedar Rapids Police Department already had received Dotson's medical records and Douglas's initial records.

counsel filed motions for discovery and depositions that same day.[3]  Counsel asked for medical records again at the September consolidation hearing.[4]  On September 19, the court granted the motion to consolidate.  On September 24, Phillips pleaded not guilty to the murder charge and demanded his right to a speedy trial.  Trial was set for December 2.

At a November 8 pretrial conference, the State indicated it was still trying to obtain medical records; the resulting order noted outstanding depositions of medical witnesses and pending discovery of "medical records, cell phone records, interview videos, [and] body cam videos."  Also on November 8, police provided copies of medical records to the county attorney.  The deposition of the medical examiner was scheduled for November 21.

On November 18, defense counsel requested an up-to-date copy of all police reports and attachments.  On November 19, the State filed notice of additional witnesses and minutes of testimony and provided Douglas's medical records—some 3000 pages—to Phillips.  On November 20, the medical examiner provided Phillips with a list of the medical records relied upon during the autopsy but did not provide the records themselves due to privacy laws.  Phillips cancelled the medical examiner's deposition, citing insufficient time to review the records and prepare.  On November 22, a case management conference order noted all

---

[3] This motion did not specifically request medical records, but it did request exculpatory evidence, materials relating to credibility or reliability of the State's witnesses, and law enforcement files.

[4] The State's response indicates the Cedar Rapids Police Department received Douglas's medical records from the treating hospital on September 17.  The police had Dotson's and Douglas's initial medical records by early February.

discovery had been provided and no depositions were pending but Phillips had recently received medical records and was still reviewing them.

On November 25, Phillips moved for sanctions against the State for "failure to comply with discovery pursuant to the orders of the court and . . . the Iowa Rules of Criminal Procedure." In particular, Phillips took issue with the late disclosure of medical records. Phillips stated he requested the medical records several times since the initial charges but did not receive any documents until November 19, giving Phillips insufficient time to have a medical expert review the records and the medical examiner's opinion before the deposition. Phillips asked for sanctions suppressing the medical records and related testimony and dismissing the murder charge. The State answered it had accommodated each specific discovery request made by Phillips and it was not planning to introduce the medical records beyond the autopsy report at trial.

On November 27 the court held a hearing on the motion for sanctions. Among the concerns raised by the court was defense counsel not seeking the medical records from any source other than the county attorney, despite knowing the medical examiner and hospital had the documents months earlier.[5] The court also surmised suppression of all medical evidence was an extreme sanction. The court spoke directly with Phillips, who continued to demand his speedy trial even knowing his attorneys would not have more time to sort through the medical records.

---

[5] The court specifically mentioned the option of filing a motion to compel seeking a court order for the medical examiner to provide the records.

On November 29, the court ruled that, although the February 6 order required the State to turn over medical records, none of the requests or orders included a date of compliance and the communications between the parties did not convey a sense of urgency to get the records. The court noted the medical examiner informed Phillips of which medical records were used in reaching the cause of death and determined prejudicial information would not be presented to the jury. While not condoning the State's delay in providing the documents to Phillips, the court found dismissing the charge or prohibiting the medical examiner from testifying about the cause of death or connection to a gunshot wound were not appropriate sanctions. The court required an offer of proof before the medical examiner's testimony to ensure Phillips was not prejudiced by the late production of the medical records.

During the jury trial, which began on December 2, Phillips's counsel discovered the produced medical records were missing a microbiology report identifying the bacteria found in Douglas's body—a major basis of the medical examiner's findings. Phillips filed a motion to compel production of the report on December 6. The court ordered the report be produced before the medical examiner's testimony. The State provided a copy of the report on December 9.

During Dotson's testimony on December 6, she mentioned having a private attorney. This private representation had not previously been disclosed to Phillips, though the State knew about it.[6] Phillips filed an application for a subpoena to

---

[6] The assistant county attorney prosecuting the case first communicated with Dotson's attorney around November 14 or 15. However, the county attorney was contacted by the private attorney on May 6, 2019.

obtain any communications between the State—both the county attorney's office and the Cedar Rapids Police Department—and Dotson's attorney referring "to any matter related to State v. Ezekiel Phillips." The court reviewed the communications in camera and redacted trial-strategy and work-product information before production to Phillips. On December 10, the court continued the trial one day so Phillips could investigate Dotson's civil suit and its potential impact.

On December 11, Phillips filed a motion to dismiss the entire case, citing discovery violations, prosecutorial misconduct, and attempted violation of his right to a speedy trial. The court held the State's failure to inform Phillips of the civil suit established a violation of the discovery order, noting the civil suit could suggest a financial incentive to Dotson for a conviction and undermine her credibility. The court prohibited the information in the additional minutes from being used in rebuttal or redirect as it related to the civil suit and would prejudice Phillips. The court also instructed the jury the State knew Dotson hired an attorney and did not disclose it to the defense, Dotson arguably had a financial incentive to testify against Phillips, and the jury could use the information in deciding whether to believe Dotson.

At the end of trial, Phillips moved for a mistrial based on the cumulative effect of the prejudicial statements made during the prosecutor's closing argument. The court denied the motion. The jury convicted Phillips of first-degree murder, attempted murder, willful injury causing serious injury, and going armed with intent.

Phillips filed a motion for new trial on grounds the verdict was contrary to the weight of the evidence, potential juror bias was not properly investigated, the court erred in limiting cross examination of an investigator, the court erred in

denying a mistrial based on the State's improper statements in closing arguments, and the court erred in denying sanctions and dismissal based on the State's discovery violations. The court denied the motion. Relevant to this appeal, the court found any improper statements during closing arguments were not designed to inflame the passions of the jury to the level addressed in *State v. Graves*, 668 N.W.2d 860 (Iowa 2003), and the court previously corrected the discovery violation caused by suppression of the civil suit information and provided an appropriate level of sanctions for the discovery violations.

Phillips appeals, asserting the court failed to adequately sanction the State for its violation of discovery orders, failure to disclose favorable evidence, and pattern of repeated prosecutorial misconduct. He also maintains the court abused its discretion in denying his motions for mistrial or a new trial.

**III. Standard of Review**

"We review rulings on general evidentiary issues . . . for an abuse of discretion." *State v. Belken*, 633 N.W.2d 786, 793 (Iowa 2001). "[D]iscovery matters are committed to the sound discretion of the trial court, and are reviewable only upon an abuse of that discretion. Error in the administration of discovery rules is not reversible absent a demonstration that the substantial rights of the defendant were prejudiced." *State v. Clark*, 814 N.W.2d 551, 563 (Iowa 2012) (citation omitted). Claims of a *Brady* violation are constitutional and reviewed de novo.[7] *DeSimone v. State*, 803 N.W.2d 97, 102 (Iowa 2011). "Trial courts have broad

---

[7] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding failure of prosecution to disclose evidence that may be favorable to the accused is a violation of the Due Process Clause of the Fourteenth Amendment).

discretion in ruling on claims of prosecutorial misconduct and we review such rulings for an abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017) (citation omitted).

"This court will not find an abuse of discretion 'unless the defendant shows that the trial court's discretion was exercised on grounds clearly untenable or clearly unreasonable.'" *State v. Piper*, 663 N.W.2d 894, 901 (Iowa 2003) (citation omitted), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010).

**IV. Analysis**

**A. Discovery violations.** "A criminal defendant has no due process right to pretrial discovery." *Clark*, 814 N.W.2d at 561. But our rules of criminal procedure do allow discovery subject to reasonable regulation by the court. *See* Iowa R. Crim. P. 2.14; *Clark*, 814 N.W.2d at 563. "Our rules of discovery exist to avoid . . . surprise" and are meant to make the trial "a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Whitley v. C.R. Pharmacy Serv., Inc.*, 816 N.W.2d 378, 386 (Iowa 2012) (citations omitted). "Consistent with the discovery rules in general, the duty to supplement seeks to clarify issues prior to trial, avoid surprise to parties, and allow a complete opportunity to prepare for trial." *Id.*; *see* Iowa R. Crim. P. 2.14(5) (noting parties have a continuing duty to disclose).

Phillips asserts the State violated discovery rules through late disclosure of Douglas's medical records and infringed on his right to a fair trial by failing to disclose Dotson's civil suit as required under *Brady*, 373 U.S. at 87.

*1. Medical Records.* Phillips claims any testimony based on the medical records—including by the medical examiner—should have been suppressed as a sanction for the State's failure to promptly provide medical records during the discovery process. Phillips claims the court should have dismissed the murder charge with prejudice, suppressed the medical examiner's testimony with respect to the microbiology report, or granted a mistrial. The court concluded, although the medical records should have been produced to the defendant earlier, the State did not violate a discovery order or the rules of criminal procedure. The court further determined that even assuming a discovery violation occurred, the requested sanctions of dismissal or suppression were excessive.

When the microbiology report was found to be missing from discovery during trial, the court delayed trial by one day, allowing Phillips time to prepare for the medical examiner's testimony. *See State v. Payne*, No. 16-1672, 2018 WL 1182624, at *10–11 (Iowa Ct. App. Mar. 7, 2018) ("Although the State's actions may have delayed the preparation efforts of [defendant's] counsel, the late disclosures did not prejudice the actual presentation of [his] defense.").

At trial, an offer of proof was made with the medical examiner prior to her testimony before the jury. In answer to a question from the court, the medical examiner testified, "[I]n terms of the mechanism of death, I purely used my autopsy findings. But the medical records assisted in determining what injury led to my autopsy findings." After a renewed request by Phillips to limit the medical examiner's testimony, the court again found no discovery violation and determined even if a violation occurred, exclusion of the examiner's testimony was not an appropriate sanction.

This is not a case where the State had the records in its possession and intentionally withheld them. That said, we do not condone the State's laissez-faire approach to obtaining medical records both for preparing their own case and in providing known discoverable items to Phillips. The prosecutor may have stuck within the letter of discovery requirements, but the State did not embody the spirit of making the trial "a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *Whitley*, 816 N.W.2d at 386 (citation omitted). "The prosecution 'has a duty to learn of any favorable evidence known to . . . others acting on the government's behalf in the case . . . .'" *DeSimone*, 803 N.W.2d at 103 (first alteration in original) (citation omitted); *see also* American Bar Association Standards for Criminal Justice: Prosecution Function 3-5.4(a)–(c) (4th ed. 2017) (providing the prosecutor has a duty to "diligently seek to identify" and "make timely disclosure to the defense of information" that might negate guilt, mitigate, impeach government witnesses or evidence, or reduce punishment, and to advise other government agencies (including law enforcement) "of their continuing duty to identify, preserve, and disclose to the prosecutor" such information). The State's lack of diligence in seeking the medical records or identifying potentially exculpatory information does not embody the high standards to which we hold our prosecutors. *See Graves*, 668 N.W.2d at 870 ("[W]hile a prosecutor is properly an advocate for the State within the bounds of the law, the prosecutor's primary interest should be to see that justice is done, not to obtain a conviction.").

However, this is also not a case where the defense had no reason to know medical records existed to excuse its own lack of diligent pursuit of the records.

The delay between the shooting and Douglas's death, as well as the infection causation findings in the autopsy report, should have created a sense of urgency in Phillips to seek the medical records and possibly retain an expert. While a defendant has limited options to access a victim's medical records, the records were known to exist for more than six months before Phillips's pretrial motion for sanctions, and the autopsy report was provided to Phillips more than four months before trial. Phillips did not seek a new order to compel with a production date included. He did not seek a subpoena of the records on his own, as would be his right, instead waiting for the State to provide the records. He waited to bring the alleged discovery violation to the court's attention until shortly before trial, claimed to not have enough time to properly address the records, and refused to waive his right to a speedy trial. The State complied with the discovery orders from the court. The court did not abuse its discretion in concluding there was no sanctionable discovery violation.

*2. Civil Suit.* When making a *Brady* violation claim, Phillips "must prove by a preponderance of the evidence '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.'" *DeSimone*, 803 N.W.2d at 103 (citation omitted). The prosecutor "has a duty to learn any favorable evidence known to . . . others acting on the government's behalf, including the police," and a duty to disclose the information regardless of whether the defendant requested it. *Id.* (alteration in original) (citation omitted). "Nondisclosure of evidence is the touchstone for suppression; the good or bad faith of the prosecutor is not relevant." *Id.* If defense counsel was "aware of the potentially exculpatory nature of the evidence and its existence," then

"the evidence is not considered suppressed." *Id.* (citation omitted). A defendant must show prejudice from the delay in disclosure of *Brady* material to establish a constitutional violation. *Clark*, 814 N.W.2d at 563.

The State failed to timely disclose its knowledge of Dotson's civil suit. However, Phillips failed to prove he was prejudiced by the late disclosure. Under the circumstances of this case—Dotson's civil suit was against a third party (the owner of the building) instead of Phillips and was not dependent on his guilt—the court's instruction regarding the State's failure to disclose and Dotson's potential financial incentive relating to her credibility was an appropriate remedy.

**B. Prosecutorial misconduct.** "The prosecutor's duty to the accused is to 'assure the defendant a fair trial' by complying with 'the requirements of due process throughout the trial.'" *Graves*, 668 N.W.2d at 870 (citation omitted). "The initial requirement for a due process claim based on prosecutorial misconduct is proof of misconduct." *Id.* at 869. We recognize a distinction between prosecutorial misconduct and prosecutorial error:

> While prosecutorial misconduct involves either the prosecutor's reckless disregard of a duty to comply with the applicable legal standard or obligation, or a prosecutor's intentional statements in violation of an obvious obligation, standard, or applicable rule, prosecutorial error is based on human error or the exercise of poor judgment.

*State v. Coleman*, 907 N.W.2d 124, 139 (Iowa 2018). To establish prosecutorial misconduct, a defendant "must show the prosecutor acted with reckless disregard of this duty or intentionally made statements in violation of an obvious obligation, legal standard, or applicable rule that went beyond an exercise of poor judgment." *Id.* Prosecutorial misconduct includes: "questioning witnesses about others'

deceit, distorting testimony, making unsupported statements during closing argument, stating the defendant lied during testimony, diverting the jury from deciding the case based on the evidence, making other inflammatory or prejudicial statements about the defendant, and more." *State v. Schlitter*, 881 N.W.2d 380, 393 (Iowa 2016).

"The second required element [of a prosecutorial misconduct claim] is proof the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *Graves*, 668 N.W.2d at 869. "We consider (1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct." *Id.* (citations omitted).

Phillips asserts the multiple alleged discovery violations constituted "a pattern of intentional and purposeful concealment of evidence," including exculpatory evidence, which demonstrated a breach of prosecutorial duties and misconduct. Phillips also claims the prosecutor committed misconduct during closing arguments by arguing facts not in evidence and by attempting to inflame the passions of the jury through argument and visual aids. Phillips asserts the cumulative effect of this misconduct should have resulted in a mistrial or the court granting a new trial.

*1. Discovery violations.* We noted our concerns with the prosecutor's diligence above, but Phillips has not established the prosecutor exhibited reckless disregard or intentionally withheld discovery. Thus, he failed to establish prosecutorial misconduct. Moreover, the district court took appropriate action

relating to the State's failing to disclose the complaining witness's civil suit, and we have already determined there was no sanctionable discovery violation. The trial court did not abuse its discretion in denying Phillips a mistrial or new trial based on prosecutorial misconduct relating to the alleged discovery and *Brady* violations.

*2. Closing argument misconduct.* Phillips claims the prosecutor committed misconduct during closing arguments by arguing facts not in evidence, vouching for witnesses' truthfulness, and attempting to inflame the passions of the jury through argument and visual aids.

"We start with the principle that, in closing arguments, counsel is allowed some latitude. Counsel may draw conclusions and argue permissible inferences which reasonably flow from the evidence presented. However, counsel has no right to create evidence or to misstate the facts." *State v. Carey*, 709 N.W.2d 547, 554 (Iowa 2006) (edited for readability) (citations omitted).

*A. Additional Facts.* Phillips claims the State argued facts not in evidence during closing arguments about the livestream video and Dotson's civil suit. During the trial, the court specifically ruled that while the State could recall Dotson to testify as to her knowledge about the livestream video broadcast the night of the shooting, the court did not "want her testifying to any insinuations as to anybody who specifically would have seen it." The State did not recall Dotson.

However, the prosecutor referred to social media during closing arguments. Concerning specific intent, the prosecutor stated, "[T]here's no other reason to pick up a loaded gun and go to your ex-girlfriend's house and to open fire after you find out that there's a new man with her that night through social media." In discussing going armed with intent, the prosecutor stated, "Why else would you pick up a gun

and drive to someone's house in the middle of the night after your ex was on social media at [the store] with another man?" Then, during rebuttal the prosecutor again implied the link:

> The defendant told . . . [a police investigator] that he had heard about this incident on social media. Well guess what was broadcast on social media a couple hours before the shooting?
> [Objection and bench conference]
> As I was saying, the defendant told [a police investigator] that he had heard about the shooting on social media. Well, guess who was broadcast hanging out with Tyrice Douglas at [the store] on social media a couple hours before the shooting; Mone Dotson.

After Phillips again objected to the rebuttal statements, the court reminded the jury, "[I]t's your recollections of the evidence that matters and that the arguments of the attorneys are their arguments, per my admonition prior to the closing arguments, as well as the jury instructions." While there was testimony during trial about the livestream video being made, there was no evidence presented that Phillips saw the video.

Phillips's counsel was the first to mention Dotson's civil suit during closing. First, defense counsel told the jury the "prosecutor hid from the defense evidence that would have beared directly on her credibility; evidence they had a duty to disclose to us that would bear directly on her truthfulness in front of you." Later, Phillips's counsel mentioned the jury instruction about Dotson's civil suit and explained it was important because it "means that people had an opportunity to show her these photographs, to go over her testimony." Counsel further said, "[T]hat's not magic. That's not corroboration. That's preparation. She was coached either by her own civil attorneys or by the State. That's not evidence that you should consider as corroboration."

In its rebuttal closing, the State addressed the civil suit directly:

> Secondly, the civil suit that they talked about this conspiracy theory that somehow we colluded to change Ms. Dotson's testimony so that it would help her somehow in a lawsuit, completely irrelevant as to the identification of the defendant. A shooting victim has the right to sue the building owner of where she lives if they feel that—
> [Objection and bench conference]
> As I was saying, Ms. Dotson's civil suit has no relevance whatsoever when it comes to her testimony.

After Phillips's closing and the State's rebuttal, the court made a formal record about the civil suit and livestream video objections. The court noted it sustained the civil suit objection and directed the prosecutor to speak in generalities. The court ruled the social media statements were "an inference [the prosecutor] was drawing from the evidence" and did not find them improper.

While some of the prosecutor's remarks—particularly about social media— may have approached or blurred the edge of the evidence presented to the jury, Phillips failed to establish he was prejudiced to an extent he was denied a fair trial. Using the prejudice factors from *Graves*, neither the social media nor civil suit explanation were severe or pervasive, the State otherwise presented strong evidence, and the court sustained both objections and cautioned the jury. *See* 668 N.W.2d at 869. The civil suit explanation was in response to the defense's credibility argument during closing. *See id.* Evaluated in the context of both sides' closing arguments and the whole trial, the contested statements did not constitute unfairly prejudicial prosecutorial misconduct.

*B. Inflammatory language and vouching.* Phillips's other claims of prosecutorial misconduct are that the State improperly used inflammatory

language and visual aids and vouched for Dotson's and Nathan's credibility during closing arguments.

A prosecutor is not permitted to use argument to vouch for a witness's credibility or "to make inflammatory or prejudicial statements regarding a defendant in a criminal action." *Id.* at 874 (citation omitted). "The governing principle does not preclude all personalized remarks; it merely precludes those that do not appear to be based on the evidence." *State v. Williams*, 334 N.W.2d 742, 745 (Iowa 1983). "[M]isconduct does not reside in the fact that the prosecution attempts to tarnish the defendant's credibility or boost that of the State's witnesses; such tactics are not only proper, but part of the prosecutor's duty." *Carey*, 709 N.W.2d at 556. "Instead, misconduct occurs when the prosecutor seeks this end through unnecessary and overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury." *Id.*

The State started its closing argument with strong language:

> You are the only people in the world who will ever be able to do justice in this case; to do justice for Mone Dotson and for Tyrice Douglas for what happened to them about one year ago when they were brutally ambushed in the middle of the night by a man in a jealous rage.
> . . . . You've seen the carnage, the two naked bodies riddled with bullets while they were defenseless in bed. This was a massacre.
> [Objection and bench conference]
> . . . .
> In a split second, as I was saying, a romantic encounter between two young lovers turned into a night of terror and left [Dotson] and [Douglas] fighting for their lives. Tyrice Douglas, a young father, left to suffer in a pool of his own blood. Then he went on to suffer for months from the shooting and then he was gone forever from this earth at the young age of twenty-seven.

The State ended its closing argument by saying, "The defendant ruthlessly shot into the naked bodies of Mone Dotson and Tyrice Douglas, tearing through tissues and bones, leaving a trail of destruction that caused [Douglas] to die." As the State ended its argument, it displayed a picture of Douglas standing with his children next to a picture of Douglas dead on a gurney.

In addition, throughout closing and rebuttal arguments the prosecutor made statements Phillips characterizes as vouching. These comments included, "It's exactly what [Dotson] said happened, because she remembers and because she's telling the truth." The prosecutor also said multiple times Dotson and Nathan had no reason to lie because they thought they were about to die. Phillips's counsel then responded by saying Dotson and Nathan embellished their stories, Dotson made up her story, and Nathan "was not truthful."

After the State's closing argument, Phillips moved for a mistrial based on the prosecutor's use of inflammatory language, display of the picture of Phillips's children next to the picture of him on a gurney, and vouching for Dotson's and Nathan's credibility during the argument. The court "didn't view the statements to be attempting to inflame the passions of the jury in order to then overcome their passions so that they would not look at the evidence." The court did not approve of the "to do justice for the victims" statement at the beginning of the closing, but found it was not sufficient to warrant a mistrial or prevent a fair trial. The court offered to refer the jury to an instruction on their duties[8] and tell them their job is not to do justice for a specific individual. The court further held:

---

[8] Instruction 8 outlined the duties of the jurors:

> In terms of vouching, it did not appear to the court that the State did impermissible vouching. It did appear that she was arguing it from the evidence. I didn't hear anything that—where [the prosecutor] insinuated she knew something the jury didn't or was personally vouching for . . . these witnesses.

The court overruled the motion for mistrial.

Considering the crimes involved and the evidence presented during the trial, we cannot say the graphic terms used in the prosecution's closing are unfair or a mischaracterization of the evidence. The statements were vivid but described the crime and were not denunciations of the defendant. While the prosecution may have approached the line, we do not find the court abused its discretion in finding the line was not crossed. *See Williams*, 334 N.W.2d at 746. The court's admonition regarding the "do justice" comment instead of declaring a mistrial was not an abuse of discretion.

The objected-to pictures displayed during the State's closing argument had been admitted into evidence during trial. "[C]ounsel may reasonably display exhibits which are in evidence." *State v. Pepples*, 250 N.W.2d 390, 396 (Iowa 1977). We agree the manner in which the prosecutor displayed the exhibits gives some cause to question the reasonableness of the display, but it did not warrant a finding of misconduct.

---

> As you consider the evidence, do not be influenced by any personal sympathy, bias, prejudices or emotions. Because you are making very important decisions in this case, you are to evaluate the evidence carefully and avoid decisions based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases. The law demands that you return a just verdict, based solely on the evidence, your reason and common sense, and these instructions. As jurors, your sole duty is to find the truth and do justice.

Finally, after examining the alleged vouching statements, we find the prosecutor is not personally vouching for the witnesses. Rather, the prosecutor is comparing the evidence to Dotson's testimony and saying they match. Saying witnesses "have no reason to lie" does not constitute personally vouching. It is the jury's responsibility to evaluate the credibility of the witnesses, and the prosecutor can make evidence-based arguments why its witnesses are credible, just as Phillips was able to question their credibility. *See Carey*, 709 N.W.2d at 556. The statements did not establish prosecutorial misconduct.

The district court did not abuse its discretion in denying Phillips's motions for mistrial and new trial.

**AFFIRMED.**