# IN THE COURT OF APPEALS OF IOWA

No. 21-1202
Filed October 11, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CRISTHIAN BAHENA RIVERA,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Poweshiek County, Joel D. Yates,

Judge.


        A defendant appeals his conviction for first-degree murder.  **AFFIRMED.**


        Chad R. Frese, Joel C. Waters, and Jennifer Frese (until withdrawal) of

Kaplan and Frese, LLP, Marshalltown, for appellant.

        Brenna Bird, Attorney General, and Darrel Mullins, Tyler J. Buller, Assistant

Attorney General (until withdrawal), and Kyle Hanson, Assistant Attorneys

General, for appellee.


        Heard by Bower, C.J., and Tabor and Schumacher, JJ.; Buller, J. takes no

part.

**SCHUMACHER, Judge.**

Cristhian Bahena Rivera (Bahena) appeals his conviction for first-degree murder. He raises two issues. First, Bahena argues the district court should have suppressed statements he made to law enforcement. And second, Bahena asserts the district court should have granted his motion for a new trial based on newly discovered evidence and a *Brady* violation.[1] We conclude the court properly found statements Bahena made to law enforcement before the placement of an immigration detainer occurred when Bahena was not in custody and determine that Bahena voluntarily waived his *Miranda* rights[2] following the discovery of the victim's body. Finally, we conclude the court did not abuse its discretion when it denied Bahena's motion for a new trial. Accordingly, we affirm Bahena's conviction for first-degree murder.

## I.      Background Facts & Proceedings

### A.      Disappearance and Investigation

Mollie Tibbetts went for an evening run on July 18, 2018, in her hometown of Brooklyn, Iowa, and seemingly vanished. Tibbetts was home for the summer after finishing her first year of college at the University of Iowa. She was reported missing to law enforcement on July 19 after she did not show up for work at a local daycare. Prior to her disappearance, she had been living that summer with her boyfriend, his brother, and the brother's fiancé. Tibbetts's boyfriend worked on a

---

[1] *See Brady v. Maryland*, 373 U.S. 83, 85 (1963).
[2] Referring to a defendant's rights as stated in *Miranda v. Arizona*, 384 U.S. 436 (1966).

construction crew and was working in Dubuque on July 18. His brother and fiancé were also out of town.

Law enforcement's investigation initially focused on determining where Tibbetts was on the evening of July 18. An individual reported seeing Tibbetts running on the east side of Brooklyn around 7:45 p.m. Phone data confirmed that Tibbetts was running at that time, but the data reflected Tibbetts suddenly began moving in a southerly direction at around sixty miles per hour. Her phone last sent a "ping" indicating her location south of Brooklyn, near Guernsey. Law enforcement focused efforts on the area around Brooklyn and around the location where Tibbetts's phone last pinged.

Despite significant manpower and resources being expended by law enforcement and the community, nearly one month went by with no solid information about what happened to Tibbetts. But on August 15, law enforcement reviewed security footage obtained from a resident's home on the east side of Brooklyn. The footage, which showed the area surrounding the resident's house on the evening of July 18, revealed a figure who appeared to be running. While the figure is not clearly identifiable on the footage, because the house with the security footage was in the area in which Tibbetts was thought to be running, law enforcement believed the runner to be Tibbetts. Over the next twenty minutes of footage, a black Chevy Malibu with chrome door handles and chrome side mirrors can be seen circling the area six times. Given the proximity of the car to Tibbetts's last known location, law enforcement determined the car represented a potential lead.

4

On August 16, Poweshiek County Deputy Sheriff Steve Kivi saw what he believed to be the Chevy Malibu identified in the security camera footage. After following the vehicle for some time, he spoke with the driver. Although there was a language barrier between Deputy Kivi and the Spanish-speaking driver, the driver identified himself as Bahena. Deputy Kivi learned that Bahena worked at a local dairy farm.

Law enforcement went to the dairy farm in the early afternoon of August 20. While one of the objectives was to speak with Bahena, law enforcement also conducted a canvas of all the employees at the farm. Three law enforcement agents spoke with Bahena. And because Bahena did not speak English, an agent from the United States Department of Homeland Security translated. Bahena informed agents that he worked at the dairy farm from around five in the morning until five at night. Bahena's schedule required him to work thirteen days straight, followed by two days off work. Bahena signed two consent forms for law enforcement to search the Malibu and Bahena's other vehicle, a Nissan Altima. They then asked Bahena, "Is it possible that you could come with us [to the sheriff's office in Montezuma] to talk to [law enforcement] about some other questions? Is it possible?" After Bahena's supervisor confirmed he could leave work, Bahena voluntarily went to the sheriff's office. Because his car was being searched by law enforcement, Bahena rode with an agent from the Iowa Division of Criminal Investigation (DCI). Bahena was not restrained, he was not searched, and he sat in the front seat of the law enforcement vehicle.

Upon Bahena's arrival at the sheriff's office, he sat in the lobby and had access to his cell phone. Officers testified that if Bahena had left, no one would

have known because Bahena was in the lobby by himself. Eventually, Officer Pamela Romero, a native Spanish-speaker, arrived at the office. She brought Bahena back into an interview room around 5:00 p.m.[3] Before the interview, she and another officer, Jeff Fink, who is proficient in Spanish, showed Bahena the door and demonstrated that it was unlocked. They then informed Bahena that he could leave at any time. Bahena was also informed that he could use his phone at any time. Officer Romero emphasized that the officers were not interested in Bahena's status as an undocumented immigrant.

For most of the interview, only Bahena, Officer Romero, and Officer Fink were present. The initial focus was on retrieving background information about Bahena. Around 7:00 p.m., the interview shifted to Bahena's knowledge of Tibbetts. He first denied knowing or ever seeing her. But he eventually conceded that he drove past Tibbetts once while he was running some errands, including picking up a vacuum from a relative. At this point—still early in the evening—the officers repeatedly accused Bahena of lying to them, insinuating that his cell phone data showed he was around Tibbetts for a longer period than he admitted to the officers. They also asserted that they had witnesses and tire prints from the area and that they would find his DNA.

Bahena then revealed that he had seen Tibbetts a few times while driving, but he denied ever speaking or interacting with her. Bahena stuck with this version of events through most of the night and into the next day. He admitted that he

---

[3] A video recording was made of the entire interview. Because the interview was conducted in Spanish, U.S. Immigration and Customs Enforcement translated and transcribed the video. It is the only translation of the interview in our record.

found Tibbetts attractive. Around 10:00 p.m., officers took a break and provided Bahena food. Then, around 11:30 p.m., Bahena was advised that an immigration detainer was being placed on him, formally detaining Bahena. Officers confiscated his cell phone. Officer Romero then attempted to give Bahena his *Miranda* warnings but omitted one of the required warnings. The State later conceded these warnings were inadequate.

While the interview was taking place, criminalists employed by DCI searched the Chevy Malibu. They found what they believed to be one of Tibbetts's hairs in the trunk. That information was passed along to Officer Romero and Officer Fink, who confronted Bahena about it. Later testing established the hair did not belong to Tibbetts. After the discovery of Tibbetts's body, investigators found blood in the trunk that was a match to Tibbetts's DNA. There was also DNA in the trunk that did not match either Bahena's or Tibbetts's known DNA profiles.

The interview continued until about 4:00 a.m. There were about nine breaks throughout the interview, ranging from roughly three minutes to a half hour. During the breaks, Bahena can be seen sleeping or exhibiting signs of being tired. He informed officers several times that he was tired. Still, Bahena's responses were coherent and he responded to the questioning.

Around 4:00 a.m., two male English-speaking agents entered the room, pressing Bahena to be truthful. One sat directly in front of Bahena. Bahena then informed Officer Romero that he would speak to her, after which everyone else left the room. At that point, Bahena informed Officer Romero that he had gotten out of his vehicle and ran alongside Tibbetts. Tibbetts threatened to call the police, which made him angry. And he admitted to a struggle with Tibbetts, although

Bahena claimed he did not remember the struggle itself. He claimed to have blacked out, reporting this sometimes happened when he got angry. He stated his memory resumed while he was driving his vehicle. He saw Tibbetts's earbuds in his car, after which he "knew she was in the trunk." He eventually stopped near a cornfield and carried Tibbetts's body into the field, concealing her body under corn stalks.

Following the interview, Bahena, Officer Romero, and other agents drove to find Tibbetts's remains. Bahena directed the officers to drive to his house so he could orient himself. He then directed the officers to the field. Around 4:30 a.m., the car arrived at an inlet between fields, extending about 400 feet off the road. Officers attempted to find the body while Bahena remained in the vehicle, but the officers were unable to locate Tibbetts.

The officers then retrieved Bahena from the vehicle and he led them to Tibbetts's remains. Tibbetts was located about sixty feet into the cornfield. Her running shorts and underwear were found several dozen feet away from her body. Her body was severely decomposed. DNA testing confirmed the body located was Tibbetts. Examinations by the State Medical Examiner and a forensic anthropologist identified between nine and twelve stab wounds to Tibbetts's head, neck, abdomen, and hands. Tibbetts's cause of death was multiple sharp-force injuries, with the manner of death being ruled a homicide.

Following the discovery of Tibbetts's body, Officer Romero gave Bahena a second set of *Miranda* warnings. Officer Romero informed Bahena, in Spanish:

> You have the right to remain silence [sic]. If you don't want to speak to me, you don't have to. You have the right to have an attorney present, if you can't pay one, one will be assign to you

without charge. You also have the right to, uh . . . want to talk to me, anything you say could be used against you. Do you understand? Once I explained this to you, do you still want to talk to me?

Bahena replied that he understood and would continue to speak to Officer Romero. And he continued to speak. Bahena largely reiterated what was said at the sheriff's office—he saw Tibbetts running and went to speak to her. She threatened to call the police, he got angry, and they began to fight. He blacked out, and came to while he was driving. When he took Tibbetts's body from the trunk, he saw blood around her head and neck. He laid Tibbetts face up in the field and covered her with corn stalks.

**B.      Motion to Suppress and Trial**

The State charged Bahena with first-degree murder by trial information filed September 14, 2018. Bahena filed a motion to suppress in March 2019, as well as a supplemental motion to suppress in August. As applicable to this appeal, his suppression motion alleged his statements were made while he was in custody and he had not received adequate *Miranda* warnings. He also claimed his confession was involuntary, due largely to the length of the interview and his lack of sleep. And Bahena claimed officers made improper promises of leniency.

A hearing on the motion was held November 13 and 14. The court found Bahena's statements were not involuntary. Additionally, the court did not find improper promises of leniency were made by officers. And from the time officers encountered Bahena at the dairy farm until the immigration detainer, the court determined Bahena was not in custody. The court determined that the officers failed to properly Mirandize Bahena at the time of the immigration detainer. Thus, the court suppressed the statements Bahena made from about 11:30 p.m., when

the immigration detainer was put in place, until Officer Romero gave the second set of *Miranda* warnings at the scene of Tibbetts's body.

Bahena's jury trial spanned seven days, from May 19 until May 27, 2021. Bahena elected to testify in his own defense, but his version of events diverged from what he told law enforcement in August 2018. At trial, he testified that two masked men broke into his home and forced him to drive to where Tibbetts was running. One of them exited the car and, a short while later, put something in the trunk of Bahena's car. Bahena was ordered to continue driving until they stopped near a field. The two men exited the vehicle and threatened to harm Bahena's ex-girlfriend and child if he spoke to law enforcement. Bahena then took Tibbetts's body from his trunk and hid her in the field. At trial, Bahena also sought to implicate Tibbetts's boyfriend, as well as a man who owned property near where Tibbetts's body was found. The jury found Bahena guilty of first-degree murder.

### C.    Post-Trial Motions

Following the jury's verdict, Bahena moved in arrest of judgment and for a new trial. In regards to the motion for new trial, Bahena asserted newly discovered evidence related to an individual named Gavin Jones, an inmate at the Keokuk County Jail, entitled him to a new trial. Bahena claimed that after he rested his case but before the jury returned the verdict, the State informed his counsel of statements Jones made to Arne Maki, another inmate at the Keokuk County Jail. Bahena's counsel declined to pursue the matter because Jones's statements were inconsistent with Bahena's evidence at trial.

Following the verdict, the State provided more information to Bahena. According to his motion, the State provided an interview conducted with Maki on

May 26, 2021. At that time, Maki informed the interviewer that Jones claimed to have killed Tibbetts and framed Bahena. In particular, he claimed to have been working with a fifty-year-old sex trafficker when he saw Tibbetts bound in the trafficker's basement. The unnamed sex trafficker was concerned that investigators were getting too close to his operation. Upon his orders, Jones stabbed Tibbetts and disposed of the body to implicate Bahena in retaliation for Bahena supposedly tipping off police to the trafficker's operation. Jones claimed to have dismembered Tibbetts and wrapped her remains in a tarp.

Bahena also asserted that a second report was newly discovered evidence. In that report, which also occurred during the afternoon of May 26, Jones's former girlfriend, Lyndsey Voss, reported that Jones claimed he killed Tibbetts. He appeared to have been high on methamphetamine at the time of the statement.

Bahena supplemented his motion for new trial on July 14. He claimed the State committed a *Brady* violation by failing to disclose evidence of a 2019 investigation into James Lowe. The motion alleged Lowe had drugged and trafficked a woman from Brooklyn around May 2018 and operated a sex trafficking ring out of New Sharon. The motion also implicated Lowe in the disappearance of another child. Bahena suggested Lowe, who was about fifty-years-old at the time of Tibbetts's disappearance and death, was the sex trafficker referenced by Jones.

Following a hearing on the motion, the court denied Bahena's motion for a new trial. The court found Bahena had not carried his burden in demonstrating the evidence of Jones's confessions was unavailable pre-verdict. Even if he had, the court found the evidence so diverged from other evidence in the case that it would not have changed the outcome of the trial. And while the court found the State

failed to disclose evidence related to the investigation into Lowe, the court held the evidence was not material to Bahena's case because there was no link between Lowe and the disappearance and death of Tibbetts. Bahena timely appealed.

## II.     Standard of Review

"We review determinations of whether to suppress both evidence obtained and statements made in violation of constitutional guarantees de novo." *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). We examine the evidence introduced both at the suppression hearing and at trial, making an "independent evaluation of the totality of the circumstances." *Id.* (citation omitted). We give weight to the district court's findings, particularly in regard to the credibility of witnesses, but are not bound by the court's findings. *Id.* at 153. That said, "[i]n considering whether a defendant's statements were voluntarily given, we give considerable weight to the district court's findings." *Id.*

We review a district court's ruling on a motion for new trial based on newly discovered evidence for an abuse of discretion. *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020). "The district court is vested with '[u]nusually broad discretion' when 'ruling on [such] a motion . . . .'" *Id.* (first alteration in original) (quoting *State v. Miles*, 490 N.W.2d 798, 799 (Iowa 1992)). A court should "closely scrutinize [such motions] and grant them sparingly." *Id.* (quoting *State v. Carter*, 480 N.W.2d 850, 852 (Iowa 1992)).

We review claims of a constitutional nature, including those asserting a *Brady* violation, de novo. *DeSimone v. State*, 803 N.W.2d 97, 102 (Iowa 2011).

**III.     Bahena's Statements to Law Enforcement**

Bahena raises several claims related to the admissibility of statements he made to law enforcement on August 20 and 21, 2018.   First, he contends statements made before the immigration detainer should have been suppressed because they were made before officers provided him *Miranda* warnings.  He also claims the second set of warnings made after the discovery of Tibbetts's body were inadequate and as such, statements made following the warnings should be suppressed.  And he claims the statements he made were involuntary, in violation of his due process rights.

**A.     *Miranda* Rights**

Our analysis of claims involving Bahena's *Miranda* rights follows a two-step process.  *See State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997).  "We first determine whether *Miranda* warnings were required and, if so, whether they were properly given.   Second, we ascertain whether the statement is voluntary and satisfies due process."  *Id.* (internal citation omitted).

**1.     Dairy Farm to Immigration Detainer**

While Bahena was subject to interrogation for much of the evening, *Miranda* warnings were necessary only if he was also in police custody.  *See State v. Park,* 985 N.W.2d 154, 168 (Iowa 2023) ("Law enforcement officers are required to give *Miranda* warnings to individuals who are both in custody and subject to interrogation.").  "For purposes of the Fifth Amendment, a suspect is in custody 'as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest.'"  *Tyler*, 867 N.W.2d at 172) (citation omitted); *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (explaining that "the freedom-of-movement

inquiry" is "only a necessary and not a sufficient condition for *Miranda* custody" because the ultimate question was "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*" (citation omitted)). "In deciding whether a suspect is in custody at a given time, 'we examine the extent of the restraints placed on the suspect during the interrogation in light of whether a reasonable man in the suspect's position would have understood his situation to be one of custody.'" *Tyler*, 867 N.W.2d at 172 (quoting *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009)). "The custody determination depends on the objective circumstances of the interrogation, not the subjective views harbored either by the officer or the person being questioned." *Countryman*, 572 N.W.2d at 557. We consider the totality of the circumstances, including four factors that help guide our determination:

> (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of [his or] her guilt; and (4) whether the defendant is free to leave the place of questioning.

*Countryman*, 572 N.W.2d at 558.

We first look to the language used to summon Bahena. "[W]hen the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist." *Park*, 985 N.W.2d at 168 (alteration in original) (citation omitted). Here, law enforcement instigated the encounter with Bahena at his place of work. But that encounter was brief, and police gave Bahena an out—they asked, "Is it possible that you could come with us to talk" at the sheriff's office. Bahena understood there was an element of choice to that question because he consented

so long as his boss agreed to let him leave. Therefore, while police began the encounter, Bahena was quickly presented with the option to terminate it, which he declined to do.

We next examine the purpose, place, and manner of the interrogation. While the encounter began at his place of work, most of the interrogation occurred in an interview room at the sheriff's office. *See Tyler*, 867 N.W.2d at 173 (explaining that while relevant, the occurrence of the interrogation at a police station is not dispositive on the issue of custody). According to the officers, the information they sought was not necessarily a confession but focused on the fact that Bahena was likely one of the last people to see Tibbetts. That said, some of the questioning suggests the officers' purpose was to seek a confession—shortly after 7:00 p.m., Officer Fink informed Bahena, "We're going to find DNA. Yours, at some location, associated with her." Shortly after that, Officer Romero questioned, "You're telling us, that it was just pure coincidence that, that possibly minutes [after he passed Tibbetts], she disappeared? What are we going to think? What is the public going to think?" The theme of Bahena's story—one in which he happened to drive by Tibbetts but did nothing else, only for her to disappear moments later—played out for the rest of the interview. Thus, the officers' conduct suggests the purpose of the interview was something other than mere fact-finding. *See Park*, 985 N.W.2d at 169 ("Their intent 'manifested in the manner of their questioning.'" (citation omitted)).

When considering the manner of the interrogation, we examine "how long it lasted, the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks,

and the type of questioning in which those conducting the interview engage.'" *Id.* (citation omitted). In this case, the interrogation lasted about six hours. During this portion of the interview, officers gave Bahena about five breaks from questioning, including one break around 9:30 p.m. when the officers gave Bahena a sandwich. Bahena had his cell phone throughout the interrogation, and Officer Romero told him he could use it whenever he wanted. Only two officers were present, and at times only Officer Romero was in the room. *See Tyler*, 867 N.W.2d at 173 (noting that the questioning was conducted by only two officers in plain-clothes). They remained calm and generally respectful. *See Park*, 985 N.W.2d at 169. That said, the questioning became more confrontational as time went on—while the interrogation started with open-ended questions about what he was doing on July 18, at one point shortly after 10:00 p.m., Officer Fink accused Bahena directly: "You killed her, right? We know it, it's not a matter of you doing it. It's a matter of why." Thus, the manner of the interrogation varies significantly throughout the evening.

Next, we examine the extent to which Bahena was confronted with evidence of his guilt. At the time, law enforcement had very little actual evidence of Bahena's guilt—they had security footage of his vehicle looping around the area Tibbetts was last seen, but little else. Even so, they used that evidence to continually question Bahena's version of events—much of the interrogation follows a similar pattern of Bahena declaring he only drove past her and the officers asserting they knew he was lying. And they confronted him with evidence they did not actually have at the time—they informed Bahena that the items of clothing he told them he was wearing were involved in the case somehow, witnesses put him at the scene,

and his phone data showed he was in the area. The questioning is often accusatory. *But see State v. Smith*, 546 N.W.2d 916, 925 (Iowa 1996) (finding the officers' decision to inform the defendants that their stories did not match was used "as a tool with which to urge the defendants to provide more information").

Finally, we must consider whether Bahena was free to leave. Officer Romero and Officer Fink informed Bahena he was free to leave at any time, and they demonstrated that the door was unlocked. *See State v. Miranda*, 672 N.W.2d 753, 760 (Iowa 2003) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (citation omitted)). The officers did not block the pathway to the door. Bahena signified he understood he was free to leave. In fact, after Officer Romero reiterated that he could leave at any time, Bahena noted, "Since I got here you told me." Bahena had access to his cell phone, so he could have obtained a ride home despite law enforcement searching his vehicles. He was never physically restrained. *See Countryman*, 572 N.W.2d at 558.

After our examination of the entire record, we conclude Bahena was not in custody until the immigration detainer was put in place around 11:30 p.m. We highlight the repeated references by both Bahena and the officers that he was in fact free to leave. For instance, shortly after 10:00 p.m., Bahena asserts his innocence by noting, "[I]f I would've want to, I would've left right away when you told me that the door was opened." Bahena objectively confirmed he understood he was free to leave. And while the questions by the interviewers were sometimes

accusatory, they did not rise to the level of undermining Bahena's freedom of movement similar to that of a formal arrest. As a result, we determine Bahena was not in custody at the time, *Miranda* warnings were not yet required, and his statements were admissible.

### 2. Post-Discovery Statements

Bahena also challenges the admissibility of statements he made following the discovery of Tibbetts's remains. He contends that the *Miranda* warnings given to him were inadequate because of the language barrier between himself and the investigators. As a result, he argues that his waiver was not made knowingly. He also alleges his waiver was involuntary and the subsequent inculpatory statements were made involuntarily for due process purposes.

The State bears the burden of establishing Bahena knowingly and voluntarily waived his *Miranda* rights by a preponderance of the evidence. *See Tyler*, 867 N.W.2d at 175. Waiver is knowing when it has "been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Park*, 985 N.W.2d at 171 (quoting *Ortiz*, 766 N.W.2d at 251). A waiver is voluntary when it "was 'the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* at 171–72 (citation omitted). We use an objective standard, looking to "the 'totality of the circumstances surrounding the interrogation.'" *Id.* at 172 (citation omitted).

We first examine whether Bahena's waiver was knowing. Bahena highlights grammatical errors made by Officer Romero when informing Bahena of his rights. Bahena also contends he was not adequately informed that his statements could be used against him in court. "[R]egardless of what language is used to convey

the warnings to [the suspect], the warnings must 'be clear and not susceptible to equivocation' and provide 'meaningful advice to the unlettered and unlearned in language which [he] can comprehend and on which [he] can knowingly act.'" *Ortiz*, 766 N.W.2d at 253 (third and fourth alterations in original) (citation omitted). The exact form of the warnings is not dispositive. *See Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). Our inquiry is "whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*." *Id.* (alterations in original) (citation omitted).

We determine the warnings Officer Romero gave Bahena complied with *Miranda*. While there were a few grammatical mistakes—she informed Bahena that he had "the right to remain silence" and that an attorney "will be assign to you without charge"—the grammatical errors do not rob the warnings of their meaning. Officer Romero also advised, "You also have the right to, uh . . . want to talk to me, anything that you say could be use against you." Bahena contends this part of the warning was inadequate because it failed to inform him that his admissions could be used against him *in court*. But law enforcement need not clarify Bahena's rights to that level of specificity. *See United States v. Castor-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007) (finding the omission of "in court" in a Spanish translation of *Miranda* rights did not invalidate the warnings). We conclude the warnings Officer Romero provided to Bahena after the discovery of the body adequately advised him of his *Miranda* rights. And Bahena confirmed he understood the rights after Officer Romero provided them. As a result, we determine his waiver was knowing.

For Bahena's waiver to be valid, it must also have been voluntary.[4] "The ultimate test is whether, under the totality of circumstances, the statements were the product of an essentially free and unconstrained choice, made by the subject at a time when that person's will was not overborne or the capacity for self-determination critically impaired." *Park*, 985 N.W.2d at 173 (quoting *State v. Bowers*, 656 N.W.2d 349, 353 (Iowa 2002)). In its ruling on the motion to suppress, the district court relied on factors identified in *State v. Payton*, including,

> defendant's age; whether defendant had prior experience in the criminal justice system; whether defendant was under the influence of drugs; whether *Miranda* warnings were given; whether defendant was mentally "subnormal"; whether deception was used; whether defendant showed an ability to understand the questions and respond; the length of time defendant was detained and interrogated; defendant's physical and emotional reaction to the interrogation; [and] whether physical punishment, including deprivation of food and sleep, was used.

481 N.W.2d 325, 328–29 (Iowa 1992) (internal citations omitted).

Bahena was twenty-four years old, not under the influence of any substances, and there is no suggestion he was "mentally subnormal." Adequate *Miranda* warnings had just been given to him. Throughout the interview prior to the second set of warnings, Bahena responded appropriately to the questions asked of him. And he was not deprived of food or prevented from taking short breaks.

---

[4] Bahena also claims his statements following the discovery of Tibbetts's remains were involuntary in violation of his due process rights. "[V]oluntariness for . . . due process purposes and *Miranda* purposes are identical." *Tyler*, 867 N.W.2d at 176 (alterations in original) (quoting *Countryman*, 572 N.W.2d at 559). Thus, we examine these issues together.

We acknowledge other factors prior to the second set of warnings could weigh towards a finding of involuntariness. Officers utilized some deceptive practices during the interrogation leading up to Bahena's inculpatory statements at the scene of the body, including suggesting they had DNA, tire prints, witnesses, and cell phone data implicating Bahena. Bahena had no prior experience with the criminal justice system. Bahena was detained and interrogated for over six hours prior to his statements—from 11:30 p.m. until around 5:00 a.m. He was being questioned more or less continuously for even longer—since about 5:00 p.m. And he had been awake since about 5:00 a.m. on August 20. Bahena was tired for much of the interrogation—he often told the officers that he was, in fact, tired, and visibly dozes off during breaks.

We note that Bahena made the inculpatory admissions at the sheriff's office after two male English-speaking officers stepped in to conduct the interview. Bahena highlights this portion of the interview, noting the officers positioned themselves fairly close to Bahena and emphasized how Bahena was "fucking up right now. You are fucking up big time. Stop fucking up." One officer also made it clear, "[The other officer] is getting mad at you. I'm getting close to getting mad." Bahena asked to speak with Officer Romero alone. It was when he was alone with Officer Romero that Bahena made inculpatory statements and took the officers to the body, after which he made the same admissions again following the second set of warnings.[5] But we do not find any of the above rises to the level required to cause Bahena's statements to be involuntary.

---

[5] Bahena claims this was evidence of an impermissible two-step interrogation. *See Missouri v. Seibert*, 542 U.S. 600, 617 (2004). But the district court found Officer

And fatigue, on its own, is insufficient to render statements involuntary. *See United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). "Instead, 'the test is whether these mental impairments caused the defendant's will to be overborne.'" *Id.* (citation omitted). When the suspect appears alert and responsive, courts are less likely to find statements were involuntary. *See id.* at 788–89 (collecting cases and finding a confession was voluntary because the defendant seemed alert and did not inform the officers he was tired). And Officer Romero testified that Bahena was alert and responsive. The transcript of the interview indicates Bahena repeatedly informed officers he was tired—after a twenty-minute break that occurred around 9:30 p.m., Officer Romero asked if Bahena fell asleep, and he responded that he had fallen asleep for a short time. Bahena informed officers he was tired another five times during the interrogation, including around 1:00 a.m., when he declared, "I want to sleep, period." And Bahena can be seen attempting to sleep whenever a break occurs. But when Bahena led the officers to the body, he was alert and did not sleep in the car on the drive to the cornfield.

We determine the State proved by a preponderance of the evidence that Bahena voluntarily waived his *Miranda* rights and the resulting statements were voluntary for due process purposes. While Bahena was tired, we look at the totality of the circumstances.[6] We conclude that Bahena's statements to law enforcement

---

Romero's testimony credible and determined the omission of a *Miranda* warning around 11:30 p.m. was a mistake and not intentional. We defer to that determination.

[6] Bahena also asserts law enforcement made improper promises of leniency during the interrogation. However, Bahena failed to affirmatively identify instances of misconduct. Instead, the entirety of his argument is as follows: "Bahena was led to believe throughout the interview that officers were merely trying to 'help' him. That was not only deceptive but untrue." Without citations to the record

after the second *Miranda* warning were an essentially free and unconstrained choice, made by the subject at a time when that person's will was not overborne or the capacity for self-determination critically impaired. Because the statements were made voluntarily, they could be used in the State's case-in-chief or for impeachment purposes.[7] *See State v. McCoy*, 692 N.W.2d 6, 30 (Iowa 2005) (collecting cases establishing involuntary statements may not be used for any purpose at trial).

## IV.    Motion for New Trial

Bahena contends the district court wrongly denied his motion for is trial. He claims the evidence related to Gavin Jones's purported confessions are newly discovered evidence. And he asserts the State suppressed the investigation into James Lowe, a *Brady* violation.

---

establishing what specific comments by officers constituted improper promises, Bahena is essentially asking this court to review twelve hours of interviews and identify misconduct. As such, the matter is waived. *See* Iowa R. App. P. 6.903(2)(g)(3). And even if we were to pull out statements containing the word "help" under Bahena's recitation of facts, given the recent guidance provided by our supreme court in *Park*, 985 N.W. 2d at 174–76, a case decided after the briefing here was concluded, we determine that law enforcement did not make improper promises of leniency. Statements such as "Let's help each other out," "Cristhian, the evidence does not lie," and "But, I want you to say it Cristhian, that— You can help me understand and so you can help yourself" do not cross the line into impermissible promises of leniency. And interviewers told Bahena after he asked what was to happen, that "I can't tell you what's going to happen to you, Cristhian." Additionally, law enforcement conveyed they could not make promises and that they were not the decision makers.

[7] In his appellate brief, Bahena concludes his argument related to his involuntary statements by asserting, "Bahena's entire interview should be suppressed as well as Tibbetts's body." But he cites no law suggesting a ground to suppress Tibbetts's remains. As such, we consider the matter waived. *See* Iowa R. App. P. 6.903(2)(g)(3). And Bahena reiterated where he placed Tibbetts's body after the second set of warnings, which we have determined to be sufficient. So even if we were to consider the argument, we determine such to be without merit.

## A.    Statements by Jones

Bahena claims the district court should have granted a new trial on the basis of newly discovered evidence, specifically the reports by Maki and Voss involving purported confessions by Gavin Jones.

> Iowa Rule of Criminal Procedure 2.24(2)(b)(8) authorizes the court to grant a new trial "[w]hen the defendant has discovered important and material evidence in the defendant's favor since the verdict, which the defendant could not with reasonable diligence have discovered and produced at the trial."  A motion for new trial on the basis of newly discovered evidence should be granted only where the evidence "(1) was discovered *after* the verdict, (2) could not have been discovered earlier in the exercise of due diligence, (3) is material to the issues in the case and not merely cumulative, and (4) probably would have changed the result of the trial."

*Uranga*, 950 N.W.2d at 243 (alteration in original) (citation omitted).  As the party moving for a new trial, Bahena bears the burden of proving each prong.  *See Carter v. Carter*, 957 N.W.2d 623, 638 (Iowa 2021).

First, we agree with the district court that Bahena failed to establish the Maki report was unavailable at trial.  According to Bahena's motion for a new trial, the State informed Bahena after he rested his case-in-chief that an inmate was claiming to be the one who killed Tibbetts.  At that time, Bahena knew enough about the allegations to recognize they "did not seem all that consistent with the evidence put forth at trial."  As a result, Bahena's counsel declined the State's offer to investigate further.  While Bahena now claims Maki's report was incomplete during trial, he failed to establish the information was unavailable during trial.  "As a general rule, a defendant is not entitled to a new trial on the basis of newly discovered evidence where the defendant was aware of the evidence prior to the verdict but made no affirmative attempt to obtain the evidence or offer the evidence

into the record." *Uranga*, 950 N.W.2d at 243  That is the case here.  As such, Bahena also fails to establish the evidence could not have been discovered through due diligence.

We turn to the Voss report.  Voss appears to have made her statements to investigators later in the afternoon of May 26, 2021, but the parties disagree as to whether the State informed Bahena of the issue at the same time as they spoke about Maki's report.  Given the conflicting reports, it is unknown if the Voss report was available or discoverable by Bahena.

But we need not decide whether Bahena had the information available at trial because he fails to establish the final element for his motion for new trial, that the new found evidence from Maki and Voss would have probably changed the outcome of the trial.  As Bahena's counsel noted in the motion for new trial, Jones's confession does not align with much of the other evidence in this case, including Bahena's own statements.

For instance, Jones claimed to have killed and dismembered Tibbetts at a "trap house" once police were getting too close, but Tibbetts's remains were not dismembered and were in a state of severe decomposition, suggesting she had been placed in the field for a while.  Bahena's version of events included men forcing him to drive to where Tibbetts was running, which was omitted—and contradicted—by Jones's statements.  And Jones claims to have wrapped Tibbetts in a tarp, but no tarp was found near the body.  And Jones claimed to have set-up Bahena because Bahena had tipped-off police to another man's sex-trafficking operation, but no such evidence was remotely suggested during trial.  Presenting this evidence at trial would have required the jury to square two widely divergent

stories. As a result, Bahena failed to establish Jones's purported admissions probably would have changed the result of the trial.

## B. Lowe Investigation

Bahena claims the district court should have granted a new trial because the State suppressed evidence related to a 2019 investigation into James Lowe for sex trafficking.[8] "To establish a *Brady* violation has occurred, [Bahena] must prove by a preponderance of the evidence '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.'" *DeSimone*, 803 N.W.2d at 103 (citation omitted).

The State does not appear to challenge the district court's finding that the State suppressed evidence of the investigation into Lowe's purported sex trafficking. As such, we assume without deciding that Bahena met his burden on that prong. And we agree with the district court that evidence of a kidnapping from Brooklyn from around the same time as Tibbetts's disappearance may have been favorable to the defense.

But Bahena failed to establish the third prong, that the evidence was material to guilt. "The Supreme Court stated evidence is material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (citation omitted). Importantly, "the materiality requirement requires the court to assess the

---

[8] Bahena also makes references to evidence potentially implicating Lowe in the disappearance of another child.

possible effects nondisclosure had on trial preparation and strategy, not merely the weight of the evidence." *Id.*

Evidence related to an investigation into Lowe did not offer a reasonable probability of a different outcome. The only evidence tying Lowe to this case is the statements Jones made about working for a fifty-year-old sex trafficker—Lowe was about fifty at the time of Tibbetts's death. Outside of that, nothing suggests Lowe was in any way involved with the case. Moreover, as described above, Jones's statements are contrary to much of the other evidence in the case. The investigation into Lowe does nothing to rectify those inconsistencies. Also, investigators determined the allegations against Lowe were baseless. Bahena requests that this court assume that two crimes cannot occur in the same county without a connection. We decline to make that leap. We determine the district court did not abuse its discretion in denying the motion for a new trial.

## V.    Conclusion

The district court properly found statements Bahena made to police before an immigration detainer was placed on Bahena occurred when he was not in custody. We find Bahena voluntarily waived his *Miranda* rights following the discovery of Tibbetts's body. We also conclude the district court did not abuse its discretion when it denied Bahena's motions for a new trial. Accordingly, we affirm.

**AFFIRMED.**