# IN THE COURT OF APPEALS OF IOWA

No. 23-1741
Filed December 4, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ANDREW RAYMOND KARVEL,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Allamakee County, Alan Heavens,

Judge.

The defendant appeals his second-degree murder conviction. **AFFIRMED**.

Shea M. Chapin of The Chapin Center, PLC, Dubuque, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant

Attorney General, for appellee.

Considered by Greer, P.J., and Ahlers and Badding, JJ.

**GREER, Presiding Judge.**

The death of Daniel Lundy, Andrew Karvel's roommate, was ruled a homicide. Following an investigation into the cause of Lundy's death, Karvel was charged with first-degree murder. Ultimately a jury found Karvel guilty of murder in the second degree, a class "B" felony, after a three-day trial. Before trial, the district court ruled evidence of Karvel's prior conviction for an assault against Lundy was admissible at trial. After the jury's verdict, Karvel moved for a new trial, claiming the State committed *Brady* violations,[1] the weight of the evidence did not support the jury's verdict, and the verdict form was improper and prejudicial. Karvel now appeals, arguing there was insufficient evidence to support the verdict and that the district court abused its discretion admitting evidence of Karvel's prior bad act and by denying his motion for new trial. After our review, we affirm Karvel's conviction.

**I. Background Facts and Proceedings.**

For many years, Lundy lived in the old Allamakee County courthouse with his roommate, Karvel. But shortly after Lundy returned home from a winter stay at a nursing home, he was found dead on the floor. On May 9, 2022, at 7:30 a.m., Karvel called 911, requesting medical attention for Lundy and telling the dispatch operator that Lundy was not breathing. First responders entered the residence, checked for Lundy's pulse, and noted that his extremities were "cool to the touch." Karvel alerted the responders that Lundy had been lying on the floor, unable to sit up, for up to two days. Within the last day, Lundy had been struggling to breathe

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding due process requires the prosecution to disclose exculpatory evidence to the accused).

through his own phlegm. After briefly discussing the nature of the scene with Karvel, first responders removed Lundy from the residence. Contrary to Karvel's statements to the dispatch operator that he was performing life saving measures on Lundy, law enforcement and the responders on scene observed otherwise, and Karvel could not logically explain why he did nothing to help Lundy where he had been left immovable on the ground for days. Only after the autopsy was completed was Lundy's death ruled a homicide. At the time of his death, Lundy was septic, but based on bruising, internal hemorrhaging, and fracturing, and the fact Lundy had not been in a "high velocity" accident before his death, the medical examiner found Lundy's cause of death to be strangulation.

Karvel was charged with the first-degree murder of Lundy, a class "A" felony. Before trial, Karvel moved in limine, seeking to bar the admission of his prior criminal behavior, specifically a simple assault against Lundy that occurred in 2019, which Karvel pled guilty to through an *Alford*[2] plea agreement. The district court reserved ruling on the motion in limine, giving both parties an opportunity to brief the issues.

Shortly before the trial, the State moved for a ruling based on Iowa Rule of Evidence 5.104(a), asking the court to admit evidence of Karvel's prior assault on Lundy, including Lundy's statements to law enforcement during the investigation of that simple assault and statements of observations by an eyewitness. Karvel resisted, asserting several evidentiary challenges to the admission of evidence of

---

[2] *North Carolina v. Alford,* 400 U.S. 25, 37 (1970) (holding "express admission of guilt . . . is not a constitutional requisite to the imposition of [a] criminal penalty").

the prior assault. After conducting the appropriate analysis, the district court ruled that the complaint, affidavit, and order of disposition were admissible.

At the trial, evidence of the prior simple assault by Karvel against Lundy was admitted. Additional evidence, including time stamps from Lundy's pacemaker and a traffic camera showing Karvel's travel around the time of Lundy's death, were admitted to partially corroborate the timeline of events on May 9. The jury found Karvel guilty of second-degree murder, one of the lesser-included offenses of murder included in jury instructions. On October 2, 2023, before sentencing, Karvel filed a motion for new trial and motion in arrest of judgment. Karvel alleged that the district court allowed unduly prejudicial prior-bad-act evidence to be admitted into evidence at trial, the verdict was contrary to the weight of the evidence, the State committed *Brady* violations, and the verdict form was improper and prejudicial. The district court found each of these claims meritless. Karvel was sentenced to fifty years in prison, with a mandatory minimum of thirty-five years. Karvel appeals.

**II. Discussion.**

In this sequence, we tackle Karvel's challenges to the (1) admission of the prior simple assault evidence, (2) the sufficiency of the evidence supporting his conviction and (3) the denial of his motion for new trial.

**A. Admission of Prior-Bad-Acts Evidence.**

The State sought to admit evidence of Karvel's previous assault against Lundy. Karvel moved to exclude the evidence. After a hearing on the motion, the district court found the criminal complaint, affidavit, and dispositional order pertaining to Karvel's simple assault conviction were admissible at the trial under

Iowa Rule of Evidence 5.404(b)(1). We review the district court's admission of prior-bad-acts evidence for an abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015).

At the onset, we consider that under rule 5.404(b)(1), the use of prior bad acts is prohibited when used to prove someone's character to show they acted in accordance with that character on a particular occasion. However, evidence "may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). We are required to evaluate the admissibility of prior-bad-act evidence under a three-step analysis: whether (1) the evidence of prior bad acts "relevant to a legitimate, disputed factual issue"; (2) there is clear proof that Karvel committed the prior bad act; and (3) the evidence's probative value "substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Putnam*, 848 N.W.2d 1, 8–9 (Iowa 2014).

Applying the test, we first consider whether the previous assault was relevant to a disputed issue of fact in this trial. The State had the burden to prove Karvel acted with malice aforethought for both first-degree murder and the lesser included charge of second-degree murder. Malice aforethought may be found through the "express or implied acts and conduct of the defendant." *State v. Gramenz*, 126 N.W.2d 285, 290 (Iowa 1964). As to the first step of the test, Karvel argues that while the district court found the evidence could be used to show motive, the State only introduced the evidence "to prove that [the chief of police] was familiar with Karvel's address" and not to prove Karvel acted with malice aforethought. During the chief of police's testimony, after confirming he was

familiar with Karvel's address, he stated "[i]n 2019 I responded to a report of an assault at that address." After admitting copies of the complaint, affidavit, and disposition over Karvel's objection, the chief of police continued and described the events of the 2019 assault. The timing and circumstances related to how the information was introduced at trial is of no consequence to whether the evidence being offered is relevant to a central factual issue. And, in the pre-trial discussions before the exhibit was admitted at trial, the State reasoned that Karvel's prior assault conviction could be admitted "for purpose of proving motive, opportunity, intent, preparation, and going to the elements of the case." *See* Iowa R. Evid. 5.404(b)(2). "Evidence of bad feelings or quarrels between the defendant and the victim are circumstances that may be used to support a finding of malice aforethought." *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003). Because the evidence was relevant to an issue at trial—whether Karvel acted with malice aforethought—and was not used for prohibited purposes, for example, improper character evidence, the admission of the prior bad act met the first step of the test.

Next, we ask whether the district court found clear proof that Karvel committed simple assault. "[P]roof of prior bad acts is clear if it prevents the jury from speculating or inferring from mere suspicion." *State v. Putman*, 848 N.W.2d 1, 13 (Iowa 2014). Karvel entered an *Alford* guilty plea to the underlying prior bad act, the simple assault. An *Alford* guilty plea may only be accepted by the court upon a showing of strong evidence of *actual guilt* and requires a defendant to accept the consequences of pleading guilty while allowing the accused to maintain their claim of innocence. *State v. Siner*, No. 17-0993, 2018 WL 1098948, at *2 (Iowa Ct. App. Feb. 21, 2018) (emphasis added) ("The court must determine

whether a guilty plea has a factual basis before it can accept it, even where the plea is under *Alford*." (citation omitted)). During the earlier assault investigation, Lundy reported that Karvel pushed him on the shoulder and threatened to throw a plastic container at him. Karvel, at the time, admitted "it was possible he put his hands on [Lundy]." The reported statements describing the assault and the *Alford* plea, taken together, are clear proof that Karvel assaulted Lundy in 2019.

Finally, we look to whether the district court sufficiently weighed the evidence to determine if the probative value of the underlying bad act was substantially outweighed by the danger of unfair prejudice. *See State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004). The State argues that the details of the simple assault were not so inflammatory to be prejudicial but instead offered details related to motive, intent, or lack of accident under rule 5.404(b)(2). The district court agreed. Following that argument, the district court also found the *Alford* plea was "highly probative" to the matter at hand. *See State v. Bassett*, No. 21-0923, 2022 WL 16630788, at *4 (Iowa Ct. App. Nov. 2, 2022) (citation omitted) (finding that evidence of the relationship was relevant to establish intent and lack of accident); *State v. Taylor*, 689 N.W.2d 116, 131 (Iowa 2004) (concluding prior-bad-acts evidence was admissible to prevent the defendant from falsely characterizing his relationship with the victim as "peaceful and friendly." (citation omitted)). And like in *Bassett*, the district court added that any prejudice caused by the nature of the bad acts could be curtailed by a limiting jury instruction, and one was given here. 2022 WL 16630788, at *5.

For these reasons, the district court did not abuse its discretion when admitting evidence of Karvel's prior bad act.

**B. Sufficiency of the Evidence.**

Karvel argues "sufficient evidence does not exist to support the jury's guilty verdict" for second-degree murder. Specifically, Karvel urges there was insufficient evidence that (1) he strangled Lundy, (2) Lundy even died because of strangulation, and (3) he acted with malice aforethought. We review sufficiency-of-the-evidence claims for errors at law. *State v. Dalton*, 674 N.W.2d 111, 116 (Iowa 2004). We review "the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) (cleaned up). We are bound by the jury's verdict if we find substantial evidence to support the guilty verdict. *See State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024).

The State charged Karvel with the crime of first-degree murder. The jury was instructed that if it did not find Karvel guilty of that charge, it must consider the lesser included offense of murder in the second degree. The jury followed the instructions and, after consideration, found Karvel guilty of murder in the second degree. To convict Karvel of second-degree murder, the State had to prove three elements:

> 1. On or about May 9, 2022, the [Karvel] strangled Daniel Lundy.
> 2. Daniel Lundy died as a result of being strangled.
> 3. [Karvel] acted with malice aforethought.

For Karvel's claim to be successful, the evidence underpinning one or more elements of second-degree murder must be such that it could not convince "a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v.*

*Quinn*, 691 N.W.2d 403, 407 (Iowa 2005) (citation omitted). The district court found that sufficient evidence exists for each of the three prongs. We address each element individually.

Elements one and two go hand in hand because strangulation does not occur in isolation. The medical examiner, Dr. Michele Catellier, offered substantial evidence of strangulation as the causation of his death. And, Karvel's own timeline from his appellate brief undercuts his argument that he could not have strangled Lundy. He points to timeline evidence from videos showing his travel and parts of the autopsy evidence related to Lundy's pacemaker. First, the timeline described by Karvel showed that shortly before 7:11 a.m. Karvel left the residence to travel to the store to purchase cold medicine. Video footage showed Karvel purchasing over-the-counter medications and then leaving the store around 7:20 a.m. According to the pacemaker interrogator, Lundy's heart went into ventricular tachycardia at 6:59 a.m., with his heart stopping at 7:37 a.m. Even with this documented evidence, Karvel admits that after he returned from the store, Lundy was conscious, he gave Lundy the purchased medicine and then shortly after Lundy stopped breathing. All of which establishes that Karvel was with or near Lundy before and at the time of his death. This timeline, although muddled by inaccurate timestamps, was partially corroborated by a store receipt and a traffic camera. The sequence of events, taken in the light most favorable to the State, is enough for a reasonable jury to conclude that Karvel was with Lundy before and after his death, with no other person on site. A jury could reasonably infer from this substantial evidence that Karvel was an actor in Lundy's homicide.

Testimony from Dr. Catellier, who performed the autopsy on Lundy, observed internal bleeding on both sides of Lundy's neck, under the outside area where she noted bruising. Damage to Lundy's carotid arteries offered another sign of strangulation, along with a broken larynx. Dr. Catellier opined that it was more likely that "hands" cause the injury because "both sides and the back of both sides were injured." And other damage to the neck area documented during the autopsy provided strong evidence that Lundy's cause of death was strangulation and the manner of death was homicide. For the jury's consideration, Dr. Catellier explained why Lundy's death was suspicious by presenting autopsy photos and pointing out irregularities, like hemorrhaging, in various anatomical structures. Although the medical examiner explained that Lundy was not a healthy man— bacteria in his infected bed sores had entered his blood stream causing sepsis— sepsis was not Lundy's ultimate cause of death. Even though some injuries suffered by Lundy could have resulted from a high-velocity accident, like a motor vehicle accident, the evidence suggested that Lundy's injuries were "recent" as she could not see evidence of "healing per se." Based upon the medical examiner's learned opinion and on the totality of the evidence, there was substantial evidence that Lundy died by strangulation. The expert testimony, along with autopsy photos, is sufficient evidence for a reasonable juror to conclude that Lundy's death was caused by strangulation.

The final element of murder in the second degree requires malice aforethought. Malice aforethought is described as:

> [A] fixed purpose or design to do some physical harm to another existing prior to the act complained of; it need not be shown to have existed for any length of time before, but only requires such

> deliberation as makes a person appreciate and understand at the time the act is committed its nature and probable consequences as distinguished from an act done in the heat of passion.

*State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010) (emphasis omitted) (citation omitted). Malice aforethought is not usually shown by direct evidence; it is often inferred by circumstantial evidence or conduct. *Id.* Here, both the act of strangulation and past conduct support a showing of malice aforethought. *See id.*; *see also Powell v. State*, No. 18-0542, 2019 WL 2524264, at *5 (Iowa Ct. App. June 19, 2019) (concluding use of strangulation supports a finding of malice aforethought on its own).

It was the medical examiner's testimony that the most likely mode of strangulation was strangulation by hands. The act of strangulation may imply malice aforethought because it takes time. *See State v. Gary*, No. 21-1476, 2023 WL 3856427, at *3 (Iowa Ct. App. June 7, 2023) ("The fact that asphyxiation takes several minutes is also evidence that supports a finding that [the defendant] acted with a fixed purpose to do harm."). The medical examiner testified that it can take only three to ten seconds for an individual to lose consciousness but four to five minutes of constant oxygen deprivation for an individual to experience permanent and irreversible brain damage, ultimately causing death.

Malice aforethought may also be implied by evidence of bad feelings or quarrels. *See State v. Kellogg,* 263 N.W.2d 539, 542 (Iowa 1978). Prior crimes between the accused and the victim can show the relationship between the two. *See State v. Hilleshiem,* 305 N.W. 2d 710, 714 (Iowa 1981) ("The prior injuries were circumstantial evidence bearing on defendant's relationship with [victim] and the credibility of his version of the occurrence which led to her death."). The prior

altercation between Lundy and Karvel adds to the permissible inference by the jury that Karvel acted with malice aforethought.

Overall, the violent nature of strangulation, the time required to cause brain death, the testimony of the associate medical examiner, and the history of an altercation between Karvel and Lundy are all sufficient grounds to imply malice aforethought.  As a result, we find sufficient evidence in the record for a reasonable juror to find malice aforethought, the third element of second-degree murder.  We reject Karvel's challenges to sufficiency of the evidence.

**C.  Denial of Motion for New Trial.**

On Karvel's last challenge, we review his motion for a new trial under Iowa Rule of Criminal Procedure 2.24(2)(b)(5), (7), and (8).  He claims the verdict is contrary to the weight of the evidence, the State committed a *Brady* violation, and the jury was improperly instructed on a material matter.  We address each of his arguments in turn.

**i.  Verdict Contrary to the Weight of the Evidence.**

"On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence."  *State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003).  "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'"  *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (citation omitted).  A motion for a new trial should only be granted in exceptional circumstances.  *Id.* at 705.

Karvel argues the verdict is contrary to the weight of the evidence because the fact finder relied upon inadmissible evidence—the prior bad act—and that there was reasonable doubt because the medical examiner did not consider Lundy's high velocity injury in her testimony. Having determined that Karvel's evidentiary claims are meritless, we decline to address them again.

In this case, the district court found "the weight of credible evidence overwhelmingly supports the verdict that this jury reached" after weighing the testimony of the medical examiner, identifying significant holes in Karvel's alleged alibi, and acknowledging Karvel's history with Lundy. Relying on the district court's determination that the medical examiner's testimony was credible and persuasive and consistent with the district court's ruling that Karvel's alibi was "full of holes"— leaving Karvel with or near Lundy, before, during, and immediately after his death, we conclude the district court did not abuse its discretion when concluding the weight of the evidence supported the jury verdict. Karvel is not entitled to a new trial.

## ii. Claim of *Brady* Violation.

We turn to Karvel's argument that the State committed a *Brady* violation by suppressing exculpatory evidence; he contends the State failed to produce the pacemaker report and the traffic camera video. "Due process claims asserting a *Brady* violation are reviewed de novo." *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). For his *Brady* claim to succeed, Karvel must show by a preponderance of the evidence, "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt." *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011). Karvel asserts he requested

the pacemaker report, but the State indicated it did not exist until the medical examiner "proceeded to pull out a report while she was on the stand and consulted the report before giving specific timeline evidence regarding the information extracted from Daniel Lundy's pacemaker." Likewise, Karvel points to testimony from the chief of police that conflicted with the State's assertion there was no traffic camera footage. On cross-examination, for the first time, the police chief stated the footage was preserved, he had access to it, and he had given it to the State.

In response, the State argues Karvel failed to prove the second prong of the *Brady* test. In that path, even if the State suppressed evidence, unless Karvel can show the evidence was favorable to him, a claimed *Brady* violation fails. As the district court explained in its ruling on the motion for new trial:

> The pacemaker indicated that Lundy's heart began beating erratically at 6:59 a.m. and stopped beating entirely around 7:38 a.m. Karvel claims that he "was not physically present in the apartment with Daniel Lundy from approximately 7:06 a.m. until he returned from [the store] around 7:25 a.m." But the medical examiner testified that it takes four to six minutes to strangle a person. So the timeline gives Karvel enough time to strangle Lundy before Karvel left for the store, or after he returned, or before and after. The timeline is a "semi-abili" instead of an alibi.
>
> Also, the State never disputed Karvel's timeline. The pacemaker report and traffic camera video would only corroborate something that was uncontested to begin with. A new trial with the pacemaker report and the traffic camera video as exhibits does not create a new timeline that helps Karvel given the relatively short time it takes to strangle someone. And Karvel told the chief of police that he administered cold medicine to Lundy, left the room, and came back minutes later to find Lundy dead. Karvel's statement puts himself at the residence immediately before Lundy died and eliminates the possibility that someone else strangled Lundy when Karvel was at the store.

Karvel failed to prove the second prong of the *Brady* analysis by preponderance of the evidence, thus, we find no *Brady* violation. *See DeSimone*, 803 N.W.2d at 103.

### iii. Jury Instruction Issue.

Our standard of review on issues of jury instructions is for errors at law. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001). Jury instructions are in error when the "instructions are misleading and confusing." *State v. Ross*, 986 N.W.2d 581, 586 (Iowa 2023). "In determining whether an instruction is inaccurate, misleading, or confusing, we look to the instructions as a whole and do not require perfection." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 902 (Iowa 2015). When the jury is wrongly instructed, "[w]e presume prejudice 'unless the record affirmatively establishes there was no[ne].'" *Ross*, 986 N.W.2d at 585 (alteration in original) (citation omitted). But reversal of the conviction and a new trial is only warranted if the error was prejudicial to the complaining party. *See State v. Hanes*, 790 N.W.2d 545, 550 (Iowa 2010).

The issue presented before this court is not the substance of the jury instructions, or even the order of the instructions, but rather, the order of the verdict options. Karvel's argument boils down to his belief that the order of the verdict form materially changed the ultimate verdict of the jury—because "Not Guilty" was listed last, the jury chose not to find him not guilty. We find no case or authority that either directly or tangentially supports finding a verdict form "inaccurate, misleading, or confusing" based on the order of the responses. Our analysis is in line with the district court's, "Karvel's complaint here is a direct attack on the competence and integrity of the jury. . . . Karvel's argument here assumes that

none of those instructions mattered because the jury will, and did, ignore all instructions and instead base their verdict on the order of verdict options." Karvel's argument is meritless. We affirm the decision of the district court on this challenge.

## III. Conclusion.

We affirm Karvel's conviction.

**AFFIRMED.**